THE STATE v. ROY LARKIN and IDA BELLE HARRIS, Appellants.

Division Two, May 20, 1913.

1. **INSTRUCTION: Reasonable Doubt: Refusal of Defendant's.** Where the court has already fully and correctly instructed on the subject of reasonable doubt and the presumption of innocence, it is not error to refuse an instruction on the point asked by defendant.

2. **MURDER: Accessory: Sufficiency of Evidence.** The fact that the defendant wife had sustained adulterous relations with her codefendant, that she had stated she wished she was free and that if her husband "was to get killed in the mine or hurt in any way" the codefendant would take care of her, and that she was present under the thorn tree with the codefendant when her husband came upon them and the shooting of pistols followed, in which her husband was killed, are not sufficient to authorize her conviction of murder.

3. **REMARKS OF ATTORNEY: Attributing Statement to Defendant Not Made.** Where a witness testified that deceased's wife, prior to the shooting, had said that if her husband "was to get killed in the mine or hurt in any way" her paramour and codefendant "would take care of her," it was error for the prosecuting attorney to say to the jury that said codefendant "got on the stand and didn't say one word about" what deceased's wife "said that he said about taking care of her in case" her husband "was killed;" "he took the stand and testified in his own behalf after having heard that statement fall from the lips of this witness, and he absolutely failed to say that he didn't make that statement to" deceased's wife. The record nowhere shows that said defendant had ever said to deceased's wife that he would take care of her if her husband were dead, and the chief vice

in the argument of the prosecuting attorney consists in not correctly quoting the record. It would not have been an unwarranted comment if any witness had attributed to defendant the statement the prosecuting attorney attributed to him and defendant had failed to deny that statement.

4. ————: **Comment on Failure of Defendant to Deny Things Attributed to Him.** When defendant voluntarily enters the stand to testify in his own behalf the .attorney for the State has a right, in his argument to the jury, to comment on the fact that defendant did not deny or explain certain damaging facts or statements attributed to him by other witnesses. The statute (Secs. 5242 and 5243, R. S. 1909) does not inhibit such comment. [Overruling State v. Graves, 95 Mo. 510, and the subsequent cases following it.]

5. ————: ————: **Holding in Other States.** Except in California and Missouri, where the ruling has sometimes been doubted, the right of the prosecuting attorney in his argument to the jury, to comment upon the failure of the defendant, when he takes the stand as a witness in his own behalf, to deny or explain incriminating facts and statements, has been uniformly held allowable. And in Missouri it has been uniformly held, in passing upon the sufficiency of the evidence, that statements made by the State's witnesses, not denied by a defendant who testifies in his own behalf, stand admitted, in the estimation of the court; and if they are to be so considered by the court, it cannot be logically seen why the prosecuting attorney may not comment on defendant's failure, while on the stand, to deny or explain them.

6. **PROVOKING DIFFICULTY: Sexual Relations With Deceased's Wife: Instruction: No Evidence.** An instruction telling the jury that if defendant "provoked, or voluntarily sought, brought on or engaged in a quarrel with deceased with the purpose of taking advantage of him and of taking his life or of doing him some great bodily harm," etc., in effect takes away defendant's right of self-defense, and should not be given when there is no evidence on which to base it. And it should not, for that reason, have been given, where defendant called at deceased's house in the night time, while deceased was absent, and after spending a half hour in conversation with deceased's wife both left the house and either went together, or met, at a hawthorn tree outside of deceased's premises, and while they were there deceased returned to the house, got his pistol and, remarking that he would "get the s—o—a—b—," went in the direction of the tree, and soon afterwards seven shots were fired, and defendant testified that deceased fired at him twice before he fired in return, and there was no evidence to contradict him, and none to corroborate him unless it be the inference (if such in fact can be

said to justify an inference) that deceased carried a revolver of a slightly less calibre than defendant's and the first two shots were not so loud as those that followed. The illicit intercourse between defendant and deceased's wife was not a difficulty brought on by defendant, such as the law recognizes, nor was it brought on by defendant for the purpose of taking deceased's life or doing him some great bodily harm; on the contrary, all the facts show that defendant and deceased's wife were avoiding deceased. Such facts did not take away defendant's right of self-defense. The "unwritten law" is no part of the law of this State.

7. ———: ———: **Presumption of Intentional Killing: Self-Defense.** While it is true that murder in the second degree is to be presumed from the simple fact of the wilful and intentional killing of one man by another, nothing further appearing, yet that presumption does not prohibit defendant from showing, if he can, that in such killing he acted in self-defense. Nor is that right of self-defense taken away, nor is such presumption conclusive, simply because defendant and deceased's wife had previously habitually indulged in illict intercourse and were found by deceased at a rendezvous to which they had gone for that purpose.

8. **REMARKS OF COUNSEL: Comment on Fact That Defendant's Daughter Did Not Testify.** Where defendant and deceased's wife met after nine o'clock at night at deceased's house and after they had engaged in conversation for a half hour or so, both left the house and met at a rendezvous where deceased came upon them and was killed, it was not error for the prosecuting attorney, in his argument to the jury, to comment on the fact that the deceased's thirteen-year-old daughter, who had gone to bed before defendant came to the kitchen, failed to testify, although it is a matter of inference clearly arising in the case that she was not in a position to see what occurred at the immediate place of the homicide.

9. **EVIDENCE: Beer Bottles.** Where the evidence shows that when defendant came at nine o'clock at night to the kitchen of deceased's house he had four bottles of beer with him and that he and deceased's wife soon afterwards went away and next morning after deceased had been killed four beer bottles were found at the place of the homicide, one of which was empty, it was not error to permit such beer bottles to be introduced in evidence.

10. ———: **Deceased's Pistol.** Where it is contended that the report of pistols of different calibres differ in loudness, and that of defendant was of a larger calibre than that of deceased, and there is evidence that there were seven shots fired and that the first shots were not so loud as those that followed, and de-

fendant testifies that deceased shot at him two or three times before he shot in return, in the interest of truth deceased's pistol (as well as defendant's) should be produced in evidence, for the purpose of ascertaining, not only its calibre, but whether it was loaded or unloaded, whether it had been recently fired, and the place where it was found.

Appeal from St. Francois Circuit Court.—*Hon. Peter H. Huck,* Judge.

REVERSED AND REMANDED AS TO APPELLANT LARKIN; ABATED AS TO DEFENDANT HARRIS UPON PROOF OF HER DEATH.

*T. M. Jackson, J. H. Malugen* and *Benjamin H. Marbury* for appellants.

(1) The mere presence of a person while the alleged crime was being committed by another, or her mental approval of what was being done, will not, in the absence of some word or act of approval or encouragement, make her guilty of that crime. State v. Valle, 164 Mo. 551; State v. Orrick, 106 Mo. 120. By neither direct nor circumstantial evidence, did the respondents show that Mrs. Harris, did actually either aid, abet, assist or advise the commission of the alleged crime; nor was it shown that she was there with that purpose in mind to the knowledge of Roy Larkin; nor was it shown that she gave him encouragement; nor was it shown that she committed a single act, made a single gesture, or uttered one word of advice; and, if this be true, then the trial court should have directed a verdict of not guilty. State v. Nelson, 98 Mo. 414; State v. Miller, 100 Mo. 606; 12 Cyc. 186. One accused of a crime should not be convicted on a mere suspicion of guilt. State v. Lentz, 184 Mo. 243. The unbroken line of expression of this court is that a judgment of conviction upon insufficient evidence should be reversed. State v. Scott, 177 Mo. 673; State v. Maham, 134 Mo. 112; State v. Marshall, 47 Mo. 378. (2) There is no evidence to warrant the trial court in giving in-

struction 6. This is so well established in this State that authorities need not be cited. (3) While it is true that all the facts and circumstances that occurred at the time of the shooting with respect thereto may properly be admitted; yet, the four bottles of beer introduced in evidence were not found until about ten o'clock on the morning after the killing and they were not an event or part of a series of events so closely connected that a knowledge of them was necessary in order correctly to determine the nature of the transaction; and their introduction created in the minds of the jurors a prejudice against appellants. State v. Hendricks, 172 Mo. 672. (4) The law-making power of Missouri has prohibited the cross-examination of the defendant upon any matter not refrred to in his examination in chief; and the right of the prosecuting attorney to comment upon the testimony of the defendant who has offered himself in his own behalf, extends no further than his right to cross-examine him in regard to matters testified to by him in his direct examination. Sec. 5242, R. S. 1909; State v. James, 216 Mo. 403; State v. Deitz, 235 Mo. 335; State v. Patterson, 88 Mo. 90; State v. Potts, 239 Mo. 415; State v. Chamberlain, 89 Mo. 133. Under the statutory provisions (Sec. 5242, R. S. 1909) it is clear that appellant (who was the defendant) having offered himself as a witness in his own behalf could not be cross-examined except as to such matters as were referred to by him in his examination in chief (and no reference was made to Cora Carrow's statement), and it necessarily follows from this, that the comment on his evidence should have been confined to such matters as he testified about in his examination in chief and cross-examination; for, if the cross-examination was limited only to such matters as he testified about in chief, upon what principle had the prosecuting-attorney the right to comment in argument upon matters about which his cross-examination under the statute

would not be allowed? Under the statute, Roy Larkin elected to take the witness stand, and chose not to testify to any matter mentioned by Cora Carrow and commented upon by the prosecuting-attorney; and the fact that he did not testify concerning this Carrow statement, the essence and spirit of the statute forbids comment upon what he might have sworn to while on the stand and which he elected not to testify about. If it is reversible error to inquire on cross-examination about matters not referred to in the examination in chief, why is it not reversible error if the prosecuting attorney comments upon a matter concerning which if the appellant had been required to testify the judgment would be reversed? Any other ruling or construction of the statute would necessarily have the effect to compel the defendant in a criminal case either to elect not to go on the witness stand at all, or if he elects to testify, then to compel him to testify fully in regard to all matters connected with the charge, even though he might thereby criminate himself. This error alone should reverse this case. State v. Graves, 95 Mo. 513; State v. Guinn, 174 Mo. 686; State v. Snyder, 182 Mo. 523. We submit it was reversible error to permit the prosecuting attorney, over the objections of appellant, and without rebuke from the court, to comment upon material and prejudicial evidence adduced by another witness, but not denied by appellant when on the witness-stand. State v. Potts, 239 Mo. 415; State v. Deitz, 235 Mo. 335; State v. Eisler, 220 Mo. 67; State v. Weaver, 165 Mo. 1; State v. Moxley, 102 Mo. 392; State v. Elmer, 115 Mo. 403; State v. Ferrell, 233 Mo. 457.

*John T. Barker,* Attorney-General, and *William M. Fitch,* Assistant Attorney-General, for the State.

(1) It is not necessary to prove a conspiracy by direct evidence; it may be shown by facts and circum-

stances in the case. State v. Walker, 98 Mo. 104; State v. Flanders, 118 Mo. 235; State v. Darling, 199 Mo. 199; State v. Fields, 234 Mo. 623; State v. Roberts, 201 Mo. 702; State v. Sykes, 191 Mo. 62. (2) Everything done or said by the parties during the time a conspiracy is in existence, is competent evidence, whether said in the presence of the other party or not. State v. Darling, 199 Mo. 201; State v. Copeland, 186 Mo. 120; State v. Roberts, 201 Mo. 728; State v. Fields, 234 Mo. 623. (3) The evidence strongly tended to support the theory of conspiracy. State v. Fields, 234 Mo. 623. (4) Instruction 6, given for the State, correctly stated the law as to one voluntarily entering into or provoking a difficulty in order to kill or injure his adversary. The evidence justified it. State v. Gilmore, 95 Mo. 563; State v. Davidson, 95 Mo. 155; State v. Weeden, 133 Mo. 76; State v. Smith, 125 Mo. 2; State v. Lewis, 118 Mo. 79. (5) The evidence of Cora Carrow tended to show a conspiracy; it was a question for the jury to pass upon. (6) The statement of the prosecuting attorney in his argument, as to the failure of the defendants to place the little girl on the stand, was not error. She was the daughter of one of the defendants, and was under the control of the defendants. State v. Emory, 79 Mo. 463; State v. Parker, 172 Mo. 191; State v. McCord, 237 Mo. 242. (7) Other states have held, that where a witness was related to a defendant or under his influence or control, and it was shown that such witness had an opportunity to know some material facts in the case, and was either not subpoenaed by the defendant, or if subpoenaed, not placed on the stand by him, and that fact was referred to by the prosecuting attorney in his argument, it would not constitute error in the case. Bagley v. State, 109 S. W. 1095; Eggleston v. State, 59 Tex. Crim. 542; Jackson v. State, 56 Tex. Crim. 28; State v. Costner, 127 N. C. 566; State v. Parker, 172 Mo. 191; Comm. v. McCabe, 163 Mass. 98; State v. Thomas, 127

La. 576.   (8)   Where a defendant takes the witness stand, and fails to deny certain criminating testimony against him, then as a matter of law, there is a presumption of law that the criminating testimony not denied is true.   State v. Preston, 77 Mo. 296; State v. Anderson, 89 Mo. 330; State v. Musick, 101 Mo. 271; State v. Alexander, 119 Mo. 461; State v. Paxton, 126 Mo. 514; State v. Taylor, 134 Mo. 127; State v. Grubb, 201 Mo. 610.   (9)   The statements accredited to the prosecuting attorney in this case are not reversible error.   State v. Ruck, 194 Mo. 440; State v. Miles, 199 Mo. 547; State v. Grubb, 201 Mo. 610; State v. Donaldson, 243 Mo. 477.   (10)   Under the common law, the defendant had no right to be a witness in the case.   1 Bishop's New Crim. Proc., sec. 1181.   (11) Statutes in derogation of the common law are strictly construed.   Perry v. Strawbridge, 209 Mo. 621; Sanders v. Railroad, 116 Mo. App. 614; Thomas v. Maloney, 142 Mo. App. 193; 36 Cyc. 1178, pt. 5.   (12)   Secs. 5242 and 5243, R. S. 1909, are contray to the course of the common law, and should be strictly construed. (13)   As originally passed in 1877, Sec. 5242, R. S. 1909, contained no provision limiting the right to cross-examine defendants.   Under that section as first enacted, a defendant who became a witness in his own behalf, was not even allowed the benefit of the constitutional immunity against incriminating himself, as against cross-examination.   1 Bishop's New Crim. Proc., sec. 1183; State v. Ober, 52 N. H. 459; Comm. v. Lannam, 13 Allan, 563; Connors v. People, 50 N. Y. 240; Comm. v. Nichols, 114 Mass. 285; Comm. v. Tolliver, 119 Mass. 312; State v. Wentworth, 65 Me. 234; Cotton v. State, 87 Ala. 103; Spies v. People, 122 Ill. 1; State v. Thomas, 98 N. C. 599; People v. Tice, 131 N. Y. 651.   (14)   Where defendant has become a witness, and has failed to deny criminating evidence against him, the law presumes the evidence not denied

250 Mo.—15

to be true, if it were in his knowledge to deny or explain it. State v. Emory, 79 Mo. 463; State v. Dickson, 78 Mo. 447; State v. Hopkirk, 84 Mo. 288; State v. Anderson, 89 Mo. 330; State v. Jackson, 95 Mo. 657; State v. Musick, 101 Mo. 271; State v. Paxton, 126 Mo. 514; State v. Taylor, 134 Mo. 127; Payne v. Railroad, 136 Mo. 594; State v. Grubb, 201 Mo. 585. (15) Defendants are not entitled to the benefit of the rule of self-defense in this case. Dabney v. State, 113 Ala. 42; State v. Emerson, 78 S. C. 83; Drysdale v. State, 83 Ga. 744. (16) This court has frequently announced the rule that where one brings on an assault, he will not be heard in self-defense. State v. Partlow, 90 Mo. 608; State v. Hopper, 142 Mo. 478; State v. Adler, 146 Mo. 25; State v. Goddard, 146 Mo. 180; State v. Sharp, 183 Mo. 715; State v. Feeley, 194 Mo. 300. The rule of imperfect self-defense does not apply in this case under the evidence. State v. Partlow, 90 Mo. 620; State v. Gilmore, 95 Mo. 560; State v. Melton, 102 Mo. 688; State v. Gamble, 119 Mo. 433.

FARIS, J.—Defendants were jointly tried on the charge of murder in the second degree in the circuit court of St. Francois county, on the 16th day of June, 1912, and being found guilty, the punishment of each of them was assessed at imprisonment in the penitentiary for the term of ten years. From this conviction, after the usual motions for a new trial and in arrest of judgment, they jointly appeal.

Defendant Ida Belle Harris was the wife of one Henry Harris, who, as the evidence discloses, was shot to death by defendant Roy Larkin, in St. Francois county, on May 3, 1912. The information charges defendant Larkin with murder in the first degree, and defendant Ida Belle Harris is jointly charged as accessory thereto before the fact. The State elected, however, to waive the charge of murder in the first de-

gree and to proceed against defendants for murder in the second degree.

The facts of the case are few and simple. Practically none of the testimony adduced on the part of the State was denied by the defendants, and likewise, practically none of the testimony adduced by the defendants was denied by the State. The facts of the homicide, in brief, are about as follows:

Deceased, Henry Harris, was by occupation a miner, engaged in labor at the time of his death upon what is called the "night-shift." His work required him to leave his home about 9 o'clock every night. His wife, Ida Belle Harris, who is one of the defendants here, for some weeks prior to the killing had been in the habit of permitting to visit her and of entertaining, during the absence of the deceased, the defendant Roy Larkin, who was a bartender in one of the saloons of Flat River. There is no direct and positive evidence that the defendants sustained toward each other illicit relations; but the inference that they did so is patent from the record.

On the night of the homicide, deceased, after preparing his lunch, and about the hour of nine o'clock, left his home for the purpose of going to his work. Some thirty minutes after deceased left, defendant Larkin came to the home of deceased, bringing with him four bottles of beer. For some little time, thirty minutes or more perhaps, defendant Larkin sat in the kitchen of the home of deceased and talked with defendant Ida Belle Harris and one Cora Carrow, the hired servant of the Harrises. During the conversation he drew from his pocket a pistol and laid the same upon a chair. When Larkin left the kitchen he returned the pistol to his pocket, and accompanied by Mrs. Harris left the house, going with her, as the subsequent testimony shows, to a point some ninety-one yards distant from, and southeast of, the house of deceased.

Shortly after the defendants had left the house of deceased together, the latter returned from his work and went into the north room of his dwelling, where he obtained from a drawer of a sewing machine a 32-calibre revolver. Deceased was heard to enter the house and to go into the north room by Cora Carrow and a young man by the name of Ames, who was in the kitchen visiting the said Cora, and with whom she was talking. Upon hearing the movements of deceased, Ames and Miss Carrow left the kitchen and passed through the house to the front porch, where they intercepted deceased. At this time deceased had the 32-calibre pistol in his hand and was heard to make threats against defendant Larkin, to the effect that he intended "to get the son-of-a-bitch." Both Miss Carrow and Ames remonstrated with deceased and endeavored to prevent him from going to the point where defendants then were; but they were unable to prevail on him to return. Shortly after deceased left his home seven pistol shots were heard by Miss Carrow and witness Ames, coming from the direction toward which the deceased had gone. Thereupon Miss Carrow and Ames got a lantern and went to a point outside of the premises of deceased, and as stated, ninety-one yards distant therefrom, and found deceased dead from a gun-shot wound. Defendant Ida Belle Harris, when Miss Carrow and Ames came to the scene of the killing, was holding the head of her husband in her lap and was crying or screaming. Miss Carrow said to defendant Mrs. Harris: "See what you have caused," and Mrs. Harris replied, "Yes, Henry is killed, and I am the whole cause of it." Defendant Larkin was standing by and witness Ames said to him: "That looks pretty bad;" Larkin replied, 'I had to do it, for he was shooting at me;" or as the witness Miss Carrow puts it, Larkin said: "Yes, I shot him, but I couldn't help it; he was shooting at me." The uncontradicted testimony is, that as stated,

seven shots in all were fired; the first two shots were not so loud as the third shot; the third shot being followed by another shot, apparently of lesser volume, after which there were three loud reports in quick succession.

It is not contended by the State that defendant, Mrs. Harris, had any physical part in the killing of deceased. Defendant Larkin admits the killing and urges self-defense. He says: "I seen it was either him or me and I shot to hit."

The only evidence which tends to show the guilt of Mrs. Harris is found in the testimony of the witness Miss Carrow, who says that Mrs. Harris talked to her on three or four occasions about deceased, saying that she (Mrs. Harris) "wished she was free; that she didn't see no more peace of her life; that she had had no satisfaction and she would rather if he [deceased] was clear out of the way," and that "if he was to get killed in the mine or hurt in any way Roy Larkin would take care of her;" and upon another occasion when Miss Carrow remonstrated with defendant Mrs. Harris as to her relations with defendant Larkin, and said to her, "If I was you I would be afraid to talk to him like you do, I would be afraid Mr. Harris would turn back sometime and catch him," that Mrs. Harris said, "She would talk to him [Larkin] until the world looked level."

Defendant Mrs. Harris did not take the stand. All of the evidence offered on behalf of defendants came from the testimony of defendant Larkin, who said in substance that on the night of the killing he left the saloon of one Romine, where he was employed as a bartender, and went to a point near the place of the killing where he met Mrs. Harris. Near the scene of the homicide there seems to have been a widely spreading red-haw tree, called by the witnesses a "thorn tree." As to what transpired between the defendants after they met at the haw tree, or as to how

long they remained there before deceased came, the record is silent. Defendant Larkin stated in his testimony that the first information he had of deceased's presence, came from hearing footsteps as of some one running tolerably fast; that deceased came up and said to him, "Larkin, you son-of-a-bitch, I am going to kill you." That thereupon deceased fired at him twice; that he then ran, and while running discharged his pistol once, firing off to one side, but without aiming at deceased; that he, Larkin, got behind a little thorn bush, and that while there deceased shot at him again, and that thereupon he began shooting at deceased.

Near the thorn tree in question and some twenty yards from the point where deceased was killed, four beer bottles were found the next morning, one of which was empty and the other three full.

As to the facts which transpired immediately at the time and place of the killing, no witness on either side testifies, except defendant Larkin. His testimony leads to the inference that he met Mrs. Harris at the thorn tree in question; while the testimony of Miss Carrow for the State leads to the inference that he left the house with Mrs. Harris, and presumably went with her to the thorn tree. This is the only contradiction presented by the record, and arises, it may be, from a failure of Larkin to state as to whether he had been at the house of deceased on the night of the homicide, but prior thereto.

The pistol with which Larkin was armed and with which he killed deceased, is shown by the evidence to have been a 38-calibre pistol, while the one with which deceased left his home is shown to have been a 32-calibre pistol. That the first two reports were less loud than the third is uncontradicted; but there is no evidence in the record as to the relative loudness of the reports of pistols of different calibres. Many matters which from this distance it would seem might have

been shown with clearness, appear darkly and vaguely, and rest largely upon inferences.

Upon the trial the court gave, among others, instruction numbered six, which is as follows:

"The court instructs the jury that if you find and believe from the evidence that defendant Roy Larkin provoked or voluntarily sought, brought on or engaged in the quarrel or difficulty with the deceased with the purpose of taking advantage of him and of taking his life or of doing him some great bodily harm, then and in that event there is no self-defense in the case however imminent the peril of the defendant may have become in consequence of an attack made upon him by the deceased."

At the close of the State's testimony defendant Ida Belle Harris offered an instruction in the nature of a demurrer to the evidence as to her, which instruction was by the court refused. Again at the close of all of the testimony Mrs. Harris prayed an instruction that the jury be directed to find her not guilty, which instruction was also by the court refused.

During the argument of the case the prosecuting attorney used this language: "Roy Larkin got on the stand and didn't say one word about what Mrs. Harris said that he said about taking care of her in case Henry Harris was killed." Thereupon defendant objected that the above statement of the prosecuting attorney was a comment on what the defendant did not testify to in this case. To this objection the court said: "Try to confine your argument within the record; proceed."

Defendant duly saved his exceptions to the above remarks and to the ruling of the court thereon, and thereupon the prosecuting attorney continued as follows: "He took the stand and testified in his own behalf after having heard that statement fall from the lips of this witness, and he absolutely failed to say that he didn't make that statement to Mrs. Harris." De-

fendant Larkin, by his counsel, again objected and asked the court to rebuke the prosecuting attorney. The court said: ''The court has said to stay within the record and that should not be commented on.'' Whereupon defendant's counsel said: ''I say, Your Honor, that it is the court's duty to reprimand counsel for making such remarks and it is the court's duty to keep him within the record; and I except to the ruling of the court.''

During the argument of the case the prosecuting attorney used this language: ''Where is the little girl? The testimony all shows that she was there, and did they put her on the stand?'' Counsel for defendant: ''I object and except to that remark, and ask that it be excluded and that the court instruct the jury to disregard it?'' The court: ''Let it be excluded and the jury will not consider it.''

The little girl referred to in the above excerpt was the thirteen-year old daughter of deceased Henry Harris and the defendant Ida Belle Harris. Her whereabouts at the moment of the killing rests almost wholly in inference. From the context it would appear that she had gone to bed some considerable time before defendant Larkin came to the home of deceased, and that perhaps the coming of her father into the room subsequently, and his obtaining the pistol and leaving the house awakened her, and that she arose, dressed herself and followed after him, perhaps immediately preceding Miss Carrow and the witness Ames, to the scene of the killing. It would thus appear from the fact that she had been in bed and that she is next definitely accounted for when she is heard calling to Miss Carrow from the point in the direction of the place of the killing, and asking that a lantern be brought, and from the fact that when seen at the place of the killing she was dressed.

The above statement is substantially what was shown upon the trial, and as heretofore stated, there is

no contradiction between the facts shown by the defendants and the facts* shown upon the part of the State, except that noted above, and which inferentially arises from the statement of Miss Carrow that defendant Larkin was in the kitchen of deceased's home on the night of the killing some hour or more prior thereto, and the statement of the defendant that he met Mrs. Harris at the thorn tree on the night in question. This contradiction may be more apparent than real, and may arise, it would seem, from the failure or neglect of defendant Larkin to state all the facts. If further facts shall become necessary to make clear what is said touching the case, they will be adverted to in their proper order.

I. Among the contentions made by the defendant and not adverted to in the above statement is that the court erred in refusing to give an instruction which defendant asked on the presumption of innocence and reasonable doubt. No error is to be predicated upon this alleged point, for the reason that the court had already fully and correctly instructed on this phase of the case, and the instruction asked by defendants in that behalf was properly refused.

Instruction: Refusal of Defendants.

II. It is contended on behalf of defendant Ida Belle Harris that one of the two requested instructions in the nature of demurrers to the evidence, should have been given by the court. Since both of these alleged errors go to the question of whether there was sufficient proof upon which to sustain the conviction of Mrs. Harris, the two points may be considered together. It will be noted that there is no contention made by the State, nor is there one word of proof to sustain such a contention had it been made, that Mrs. Harris actually participated in any physical manner whatever in the

Sufficiency of Evidence.

shooting and killing of her husband. That she was present at an agreed rendezvous with her paramour, Larkin, when deceased appeared and interrupted the meeting between her and her co-defendant Larkin, there is no doubt, but we need not cite authorities that mere presence at the scene of a killing without more, does not constitute that aiding, abetting, assisting, encouraging, or advising such killing, required by the law to constitute guilt. The attitude in which she was found when first seen after the killing, and her language and apparent remorse, inferentially negative any active participation by her. All that is shown connecting her in anywise, with the most reprehensible condition of affairs shown by this record, are the statements shown in evidence by the testimony of Miss Carrow as coming from her, and which are set out in the above recital of facts. In the cross-examination of Miss Carrow, however, which we have not set out, the latter specifically says that Mrs. Harris made no threats that she was going to kill her husband or to procure his killing by anybody else, or that she had any plans for having him killed. That her conduct was most reprehensible goes without saying; that she was guilty of adultery is by fair inference to be deduced from the record; but there is a distinction between reprehensible, and even adulterous conduct, and murder in the second degree of which she was convicted. We are not called upon to characterize her conduct; but upon the record we are clear that her conviction was not warranted from the testimony, and that the court erred in refusing to so instruct the jury. What is said above renders it unnecessary to deal with the further objection of defendants that the court erred in instructing the jury as to the law touching accessories before the fact.

III. Defendants strenuously urge that the court erred in permitting the prosecuting attorney to com-

Remarks of
Prosecuting
Attorney. ment upon the failure of defendant Roy
Larkin, who took the stand as a witness
in his own behalf, to deny certain state-
ments which the prosecuting attorney
averred had been made by him to Mrs. Harris.

Leaving for a moment the broad and ever-recur-
ring question of the right of prosecuting attorneys to
comment upon the failure of a defendant who takes the
stand to testify to facts within his knowledge, or to
facts and statements attributed to him, we might say
in passing that, upon the record and outside of this
question, there is no warrant in the testimony for the
statement of the prosecuting attorney.    The record
nowhere says that defendant Larkin had ever said to
Mrs. Harris that he would take care of her if Henry
Harris were dead.  All the record does show on this
point comes from the witness Miss Carrow who says,
in substance, that Mrs. Haris told her that if Harris
were dead Larkin would take care of her (Mrs. Har-
ris).   In our view, the chief vice in the utterance of
the prosecuting attorney in this behalf arose from the
fact that he was not correctly quoting what the rec-
ord showed.   The mere fact that Mrs. Harris had made
the statement to Miss Carrow to the effect that her co-
defendant Larkin would take care of her in the event
of her husband's death, does not show or indicate nec-
essarily that such statement was predicated upon a
promise of defendant Larkin so to do.   The statement
may have been made on the part of Mrs. Harris as an
inference from his attentions to her, or as a mere
boast of conditions which would necessarily arise from
her conquest.  At least Mrs. Harris did not say that
she made the statement as the result of any suggestion
to that effect from Larkin, or by reason of any prom-
ise on Larkin's part so to do.

This objection is an eternally recurring one and
is present in practically half of the appeals in criminal
cases with which we are required to deal.  It has been

said in a late case (State v. Ferrell, 233 Mo. 452) that the inhibition upon counsel for the State to comment upon the failure of a defendant when a witness upon the stand to testify upon any fact in issue, or to deny any fact testified to by another witness, has been the settled law of this State since the decision in the case of State v. Graves, 95 Mo. 510. The learned judge who wrote the opinion in the case of State v. Ferrell, supra, from which we quote above in substance, says, however, that the statute upon which this ruling is based does not, in express terms, deny the right of the State so to comment. That this is the correct view there can be no doubt, when we consider the history of the law and the language used by the statutes, which the learned judge in question had in mind. Prior to the year 1877 the common law prevailed in this State as to the evidence of a defendant on trial upon a criminal charge. Such defendant was incompetent to testify in his own behalf. So the common law stood until the year 1877, when a statute was passed changing the common law rule and granting defendant the right, or privilege, of being sworn as a witness in his own behalf. [Laws 1877, p. 356.] When first written and passed this statute contained two pertinent sections, which read as follows:

"Sec. 1. No person shall be rendered incompetent to testify in criminal causes by reason of being the person on trial or examination; but any such fact may be shown for the purpose of affecting his or her credibility; Provided, that no person on trial or examination shall be required to testify, except as a witness on behalf of the person on trial or examination: And, provided further, that the neglect or refusal of the person on trial or examination to testify in the cause, shall not raise any presumption of guilt, nor shall that circumstance be referred to by any attorney prosecuting in the cause, nor shall the same be considered by the court or jury before whom the trial takes place.

"Sec. 2. If the accused shall not avail himself of his right to testify in any case, it shall not be construed to affect his innocence or guilt."

In 1879 this law was amended into its present form and was made to read as it now stands, as follows:

"Sec. 5242. No person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial or examination, or by reason of being the husband or wife of the accused, but any such facts may be shown for the purpose of affecting the credibility of such witness: Provided, that no person on trial or examination, nor wife or husband of such person, shall be required to testify, but any such person may, at the option of the defendant, testify in his own behalf, or on behalf of a co-defendant, and shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case: Provided, that in no case shall husband or wife, when testifying under the provisions of this section for a defendant, be permitted to disclose confidential communications had or made between them in the relation of such husband and wife.

"Sec. 5243. If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place."

Every State in the American Union, except the State of Georgia, has, either prior or subsequent to the enaction of our statute in 1877, passed similar statutes conferring competency upon the accused as a witness for himself in a trial upon a criminal charge. In passing, we may say that in Georgia the accused is permitted, without being sworn, to make a statement

to the jury; and in Washington he may be either sworn as a witness in his own behalf, or he may make a statement without being sworn, at his election.  In more than half of the states the common law bar is raised, and the accused is made competent to testify by statutes, in substance providing, that "he may, at his own request, and not otherwise, testify for himself in any criminal trial or proceeding, but his failure, or neglect, or refusal, so to testify, shall create no presumption against him, nor shall the same be referred to by the prosecuting attorney in his argument of the case."  In Iowa, by statute, any reference in argument to the failure of a defendant to take the stand as a witness in his own behalf by the prosecuting attorney, is made a misdemeanor.  We have carefully examined the statutes and holdings upon this question of more than thirty states, and we find that it has been universally held that if the defendant is not sworn as a witness in his own behalf, any comment by the prosecuting attorney to his failure so to testify constitutes reversible error, in the absence of a peremptory and proper rebuke by the trial court.  *But on the other hand,* except in our own State and in California, where the question has been sometimes doubted, *the right of the prosecuting attorney to comment upon the failure of the defendant, when he takes the stand as a witness in his own behalf, to deny or explain incriminating facts and statements,* has been uniformly held allowable. [Solander v. State, 2 Colo. 48; State v. Tatman, 59 Iowa, 471; Stover v. People, 56 N. Y. 315; Heldt v. State, 20 Neb. l. c. 500; Comstock v. State, 14 Neb. 205; State v. Staley, 14 Minn. l. c. 118; Cotton v. State, 87 Ala. 103; Clarke v. State, 87 Ala. 71; Lee v. State, 56 Ark. 4; McCoy v. State, 46 Ark. 141; Brashears v. State, 58 Md. l. c. 567; McFadden v. State, 28 Tex. Crim. 241; Lienburger v. State, 21 S. W. (Tex.) 603; Parker v. State, 62 N. J. L. 801; State v. Harrington, 12 Nev. 125; State v. Ulsemer, 24 Wash. 657; Hanoff

v. State, 37 Ohio St. 178; State v. Ober, 52 N. H. 459; State v. Glave, 51 Kan. 330; Toops v. State, 92 Ind. 13; Commonwealth v. McConnell, 162 Mass. 499.] *The rule that no reference shall be made to the neglect, failure or even refusal of a defendant to avail himself of his right to testify shall not be commented on in the event he does not become a witness in his own behalf,* is therefore, we find, universal; but on the contrary the rule that *if he does go upon the witness stand he then stands in the precise attitude of any other witness,* is also, except in this State, and as stated, in California, where the rule is subject to some doubt, also universal. Mr. Wharton in his learned and able work on Criminal Evidence, lays down, in the tenth edition thereof, the rule that such comment is allowable; to. this statement of the text *he cites no exceptions,* and correctly quotes the Missouri courts as entertaining like views. [1 Wharton, Crim. Ev. (10 Ed.), sec. 435a.] This assumption of Mr. Wharton is based upon the holding of this court in State v. Testerman, 68 Mo. l. c. 414; State v. Anderson, 89 Mo. l. c. 330. Mr. Underhill doth the like (Underhill on Crim. Ev., 2 Ed., sec. 68). Also, so says Mr. Best (Chamberlayne's Best on Ev., p. 538). Between the taking effect of the above quoted Act of 1877 and the amendments thereof in 1879, no doubt was entertained by this court as to the right of comment upon what a defendant testifying for himself either said, or failed or neglected to say. But subsequent to the amendment quoted, this court, Judges SHERWOOD and BRACE for years dissenting, began to hold that comment by the prosecuting attorney upon the failure or neglect of a defendant, even when he testified for himself upon the stand, to deny or to explain any fact in the case testified to by any other witness, was reversible error. The only thing in our statute urged as limiting the right of comment was said to be the following, to-wit: "And shall be liable to cross-examination as to any matter

referred to in his examination in chief.'' Yet our statute now under discussion, remarkable to say, contains other language qualifying the above proviso, *which language is not found in any other of the statutes of the States of the Union examined by the writer.* This language is the following, to-wit : ''And may be contradicted and impeached as any other witness in the case.''

Thus we note, our Legislature by these two statutory clauses, which are utterly contradictory in practice, has gone farther in favor of the restricted judicial construction, as well as farther against it, than has the Legislature of any other State in the Union. This contradiction in practice arises from the now well-settled rule, that in cross-examination the defendant may be asked if he has ever been convicted of a felony or other crime. [State v. Spivey, 191 Mo. 87; State v. Blitz, 171 Mo. 530; State v. Thornhill, 174 Mo. 364.] This, of course, upon the theory of impeaching his credibility as a witness; an impeachment effected indubitably by a plain violation of the clause of the statute limiting defendant's cross-examination. We are not criticizing the rule or learning in the cases cited; we are merely suggesting the palpable contradiction, *arguendo,* as a reason why if we are to be logical, we should be uniformly logical.

For many years, and in practically every jurisdiction in the American Union, it has been vehemently urged, in perhaps more than a hundred cases, that the right of the State to cross-examine a defendant, who, at his own request, and not otherwise, takes the stand as a witness in his own behalf, is limited by the constitutional inhibition against self-incrimination. But without citing cases it may be said that this question is now well settled against the contention urged. The contention that, absent a statute such as we have, cross-examination is limited by the constitutional rule against self-incrimination, has been exploded utterly

on the ground that there is sufficient protection against self-incrimination, when it is provided that a defendant may, or may not, testify for himself, according as he may desire.  If he desires to save himself from cross-examination he may do so by refusal, failure or neglect to become a witness for himself.  This provision has been held to be an absolute protection so far as the constitutional right is concerned.  The defendant waives the right of protection against self-incrimination by electing to become a witness for himself; so becoming a witness he may be cross-examined by the State, in the absence of a statute, to any extent, whether his answers may tend to convict him or not.  When our statute conferring competency upon a defendant to testify for himself was first enacted, it did not contain, it will be noted, any provisions limiting the State in its right to cross-examine him.  When this statute was enacted, the constitutional question of self-incrimination arising from an unlimited privilege of cross-examination had not been settled by adjudication.  Evidently the lawmakers, when they placed this clause in our present statute, were laboring under the fear that the absence of such a provision would invade the defendant's constitutional rights.

By the terms of the clause of our statute forbidding cross-examination, the constitutional privilege against self-incrimination is expressly provided, without the necessity for a reference of the point to a judicial construction now well and abundantly settled.

Section 5243, supra, of our statute, as do the statutes of a great majority of the other States in the Union, in substance provides that "if the accused shall not avail himself of his . . . right to testify . . . on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor . . . raise any presumption of guilt, nor be referred to by any attorney in the case."  Nothing is clearer, when

we consider the history of this legislation; when we consider that at common law the defendant could not testify in his own behalf, and that the two sections of our statute were intended to modify the common law; and when we consider the rule that this modification of the common law ought to go no further in its construction than its terms expressly provided, than that there is no legal or statutory prohibition against comment by the prosecuting attorney in any case, if in fact the accused *does avail himself of his right to testify*. In logic and reason it is no argument against this view that the State by an express statutory provision is precluded from cross-examination of the defendant upon any matter other than that about which he shall himself testify in his examination in chief. The right of the defendant to testify when he takes the stand as to all and singular the pertinent facts and issues, is absolutely unlimited. If a witness in a case shall have testified to statements made by a defendant or shall have testified to incriminating facts and circumstances, it is absolutely in the power of the defendant to contradict or explain, or put his own construction on such facts and statements and circumstances. As a witness upon the stand defendant has the power to touch upon any phase or feature of the case, and it is no valid argument to say that this provision, put into the statute, as would appear, on account of the fear of the lawmakers that absent such a provision the cross-examination of the defendant might trench upon his constitutional rights against self-incrimination, in any way affects this condition. Other States, as we have seen, *without having in their statutes the* provision that a defendant testifying for himself *"may be contradicted and impeached as any other witness in the case,"* have yet with practical unanimity held that if a defendant avails himself of his right to testify, he then stands as any other witness, and his silence in explaining, and his failure to deny or contradict in-

criminating facts, statements or circumstances, may be fully commented on by the prosecuting attorney. It is our duty to construe our own statutes as we find them, in the light of their language, intent and logic. There is no valid reason for the construction which has long been put by this court upon this provision of our statute. It is in absolute conflict with the rule announced by the text-writers and diametrically in conflict with the holdings of at least forty-six States in this Union on this identical question. In Iowa, as has been noted, there is a statute making the prosecuting attorney guilty of a misdemeanor if he refers to the failure of the defendant to take the stand and testify in his own behalf, but if the defendant does take the stand and does make himself a witness for himself, the right of comment upon the defendant's failure to deny or contradict incriminating facts, statements or circumstances, is left absolutely open to the State. [State v. Tatman, supra.] Time and again, ever since the rule announced in State v. Graves, supra, which is now criticized, was first enunciated, this question has been up for ruling. It needlessly, and in the writer's view erroneously, reverses more cases than any other single point which we are called on to review. It is no new doctrine that is here announced (State v. Anderson, 89 Mo. l. c. 330); and even subsequent to the holding in State v. Graves, supra, it was said by Judge SHERWOOD, in State v. Musick, 101 Mo. l. c. 271, that *"these statements made by the State's witnesses were not denied by defendant, and, therefore, stand admitted, as much so as if the defendant had admitted them in terms.* His previous preparations; his threats; his coming from behind the counter with weapon drawn and ready, as well as Burnett's vain efforts to interpose, all stand admitted." In that case and therefore in this utterance all of the judges of this court apparently agreed; for it was an opinion in Banc, in which all concurred. Indeed, for eleven years after the stat-

ute in question was first passed by our Legislature, the right of the State, through its prosecuting attorney, to comment, when the defendant took the stand as a witness for himself, upon his failure to deny or explain incriminating statements, facts or circumstances, *was never denied.* [State v. Emory, 79 Mo. 1. c. 463; State v. Dickson, 78 Mo. 438; State v. Hopkirk, 84 Mo. 278; State v. Anderson, 89 Mo. 1. c. 330.] For years subsequent to the rendition of the opinion in State v. Graves, supra, where the contrary doctrine to the one discussed here was first enunciated in this court, the cognate rule above referred to, of presumption arising as a matter of law from the failure of the defendant to deny incriminating facts or circumstances, was fully recognized. [State v. Musick, 101 Mo. 1. c. 271; State v. Paxton, 126 Mo. 1. c. 514; State v. Alexander, 119 Mo. 447; State v. Patrick, 107 Mo. 147; State v. Taylor, 134 Mo. 109; State v. Good, 132 Mo. 1. c. 124; State v. Jackson, 95 Mo. 1. c. 657.] It is difficult to see why, if such a presumption is as a matter of law entertained against a defendant when he takes the stand as a witness in his own behalf, such presumption might not be commented on by the prosecuting attorney in a case where the defendant likewise becomes a witness in his own behalf. We concede that if there were any restrictions whatever placed upon the defendant as to the nature or extent of his testimony when he has elected to become a witness for himself, then there would be some reason in the rule. But there is no such restriction upon him. His right to explain, deny and contradict is as unlimited as the rules of evidence and as broad as the issues pertinent to the matter under inquiry. In order to reach this conclusion we must perforce read into section 5243 words that have not been placed in that section by the Legislature. We must make the first clause of that section read: ''And if the accused shall not avail himself of his . . . right to testify *on any question, point, fact or circumstance,*

then," etc. When we consider that the statute in question changes the common law, it is difficult to see our warrant for reading into this section words that the Legislature has not in express language placed therein. We conclude that the case of State v. Graves, 95 Mo. 510, l. c. 513, which enunciated the rule that no comment shall be made by the prosecuting attorney or other counsel for the State on the failure of the defendant to testify about or to deny or contradict any statement, fact or circumstance in the case, as well as other cases in this State which announce the same rule, following the case of State v. Graves, ought to be overruled and no longer followed in this behalf. We conclude, therefore, that the point made by defendant touching the comment of the prosecuting attorney, in so far as the objection thereto was applicable to the facts, was allowable, and that the court committed no error in the premises.

IV. The defendant Larkin, with whom, in the views above considered, we are alone concerned, contends that under the facts in this case the giving of instruction numbered six set out in the statement herein, was error. This instruction was based upon the theory that defendant Larkin in some wise "provoked, or voluntarily sought, brought on or engaged in the quarrel or difficulty with the deceased with the purpose of taking advantage of him and of taking his life or of doing him some great bodily harm."

Provoking Difficulty: Liason With Wife. Can it be said upon the facts in evidence upon this record that there was testimony upon which to bottom this instruction? That in a proper case a proper instruction as to voluntarily provoking or seeking a difficulty, may be given, we have no doubt. This question is so well settled that we need cite no authorities in support thereof. But in order to make proper the giving of such an instruction as this, which, if the facts support

it, practically takes away from the defendant the right of self-defense, depends on the facts and circumstances of the case; and the pertinent inquiry here is whether there was in the record sufficient facts to show that defendant Larkin did voluntarily engage in the difficulty which resulted in the death of deceased. The testimony for the State shows that Larkin on the night in question had been at the home of deceased for no good purpose. The whole trend of the testimony indicates that he sustained, and had been for some weeks sustaining, illicit intercourse with the wife of deceased, Larkin's co-defendant here. The testimony indicates that as a rule this illicit intercourse was not had in the home of the deceased, but that the defendants adjourned to some suitable spot in the vicinity. Such an adjournment was apparently had on this occasion; for we note that after some conversation in the kitchen both of the defendants left the house of deceased. Whether they left together or not is not clear from the record. From this lack of clearness arises, it would seem, the apparent contradiction between the testimony of defendant Larkin and the testimony of Miss Carrow. Whether they went together to the fatal thorn tree or not, or whether Mrs. Harris went by herself to the thorn tree after she and Larkin left, and later was joined there by Larkin, makes no difference. They had both left the house of deceased. The facts show that they were seeking the darkness and not light; that they were evading a probable difficulty, and not seeking to bring it on. The fact that Larkin and his co-defendant had left the premises of deceased and gone out to uninclosed and unimproved property, presumably, and so far as the record shows, belonging to others, shows that so far as the physical encounter was concerned, defendant Larkin was avoiding the same and not bringing it on or seeking to bring it on. Had he remained in the home of deceased, where he had no right to be, and where he unlawfully was, there might

be some sort of a peg upon which to hang such a theory. But he left the home of deceased and went with or met (it matters not which) his co-defendant and guilty paramour at a place distant therefrom and where he might well be supposed to have believed the deceased would not come, and of which he might well have believed the deceased would have no knowledge. The whole testimony shows that the deceased came back to his home, armed himself and left his home armed and threatening; that he hunted up defendant, and whether deceased fired first or defendant fired first, is, outside of whatever corroborating circumstances there may be in the loudness of the respective reports of the pistols, a matter resting on defendant's testimony alone. Since the defendant Larkin at the point where the difficulty occurred, was not on the premises of deceased, but on the premises of others, distant from the home of deceased, wherein does this case differ from a case which would have been presented if deceased, hearing that defendant Larkin was in company with the wife of deceased upon a public street, or any other public place, or even private place, should have armed himself as he did and gone threatening defendant Larkin as he did, to seek him and kill him? It is true that under the well-settled law in this State murder in the second degree is to be presumed from the simple fact of the willful intentional killing of one man by another, nothing further appearing. [State v. Lane, 64 Mo. 319; State v. Gassert, 65 Mo. 352; State v. Stoeckli, 71 Mo. 559; State v. Frazier, 137 Mo. 317; State v. Anderson, 98 Mo. 461; State v. Harris, 76 Mo. 361.] Yet such presumption, while it attaches to the acts of the defendant here, does not prohibit him from showing, if he may, and can, that in such killing he acted in self-defense. It is not the duty of this court to enforce what is very commonly called the "unwritten law." The Legislature of this State has not

seen fit to enact into a statute this "unwritten law." It is our duty to enforce the law as we find it, and as written by the Legislature, and not as we might otherwise write it, or as we might desire it to be. If the uncontradicted facts as shown by the State in this case are true, the inferences arising therefrom corroborate the statement of defendant Larkin. The written law is, and the law which we must enforce says, that even if the deceased had discovered his wife and her co-defendant Larkin *in flagrante delicto,* and being overcome by his passion had shot and killed defendant Larkin, yet under the strict letter of the law he would not go acquit. He would have been guilty even then, however human his passion and failing in that behalf would have been, and however much it might be said that the sympathies of man for man might go out to him; he would yet have been guilty of manslaughter in the second degree. [State v. Holme, 54 Mo. 153.] The theory of the State in this case that no right of self-defense existed under the facts here in favor of defendant Larkin is not tenable. Such a theory would be tenable only if the law were that if deceased had killed Larkin instead of Larkin having killed deceased, deceased would be guilty of no crime, or at least of no felony. But since as we have seen, even had the facts been thus reversed, instead of as they are, deceased would not have been guiltless, but on the contrary would have been guilty of manslaughter in the second degree. So the right of self-defense still enured to Larkin, however outrageous and morally reprehensilbe and indefensible his conduct and actions might have been and in fact were. The court properly instructed, therefore, under the facts and circumstances shown in evidence, that Larkin was entitled to his right of self-defense, and so instructing, the court ought not, under the facts shown by the record, to have given instruction numbered 6, and thus have limited defend-

ant's right in this behalf. In our view, under all of the facts and circumstances in this case, the giving of instruction numbered 6 constitutes such error as must result in the reversal of this case.

V. As this case is to be retried, we might say that there is no merit in the objection of defendants to the introduction of the beer bottles, about which defendants so bitterly complain. Nor is there any objection to the comment of the prosecuting attorney as to the failure of the daughter of defendant Ida Belle Harris to testify in this case; although it is a matter of inference clearly arising from the fact, that she was perhaps not in a position to see what occurred at the immediate place of the homicide. [Underhill Crim. Ev. (2 Ed.), sec. 68.]

**Evidence.**

In passing, it may be said, since this case is to be retried, that many points rest in dark and obscure inference only. If it be a fact, as urged in argument of learned counsel for defendant, that there is a difference in the loudness of reports of pistols of different calibres, this point might be elucidated, rather than left in vague inference, as it now appears of record; and if it be the office of courts, as we assume it is, to search out and find the truth, some definite and certain evidence might be shown upon the retrial as to the condition of the pistol of deceased; whether it was loaded or unloaded; whether, if it be a fact, that it had been recently fired or not, and the place of finding such pistol. Such showing would tend materially to elucidate the relative positions of the State and the defendant, and to show, it may be, more unmistakably, his guilt or innocence.

Upon the submission of this case, suggestion *ore tenus* of the death of defendant Ida Belle Harris pending her appeal, was made, but the State not confessing the fact, the point was laid aside for proof, which

being subsequently furnished shows the fact of her death, and as to her therefore the cause abates.

It results from what has been said that this case ought to be reversed and remanded for a new trial as to defendant Roy Larkin. Let it be so ordered. *Brown, P. J.,* and *Walker, J.,* concur.