## THE STATE v. OLLIE BARKER, Appellant.

Division Two, June 8, 1922.

1. **CRIMINAL PROCEDURE: Failure to Comply with Rules: Penalty.** Rule 19 of the Supreme Court, which requires the attorney for the appellant to file in the office of the clerk of the court "a statement containing apt reference to the pages of the transcript, with an assignment of errors and briefs of points and an argument," applies to both typewritten and printed briefs. And where such attorney filed a typewritten brief which failed to refer to any portion of the record where the matters complained of could be found and also filed a transcript containing the testimony of numerous witnesses and some exhibits, but without an index, the Supreme Court could, with propriety, under its uniform and established rulings, refuse to consider any of the questions discussed in such brief; but having carefully read the record and brief, the court expressed its views on the main issues in the case, as though a proper brief had been filed.

2. ————: **Demurrer to State's Evidence: Waiver.** Where defendant demurred to the evidence at the close of the State's evidence, and did not stand upon his demurrer, but put in evidence on his own behalf, he thereby waived his right to complain of the overruling of his demurrer, as the jury were bound to consider the case with reference to all the evidence on both sides.

3. ————: **No Demurrer at Close of Case.** The defendant did not file a demurrer to the evidence at the conclusion of the whole case, and even had he done so, it would have been the plain duty of the court to overrule it, as there was substantial evidence tending to show his guilt.

4. ————: **Competency of Witnesses: Insane Person.** Where defendant, in a prosecution for murder, objected to a witness, offered on behalf of the State, on the ground that he had been adjudged insane and was therefore incompetent to testify, the burden was upon

State v. Barker.

him to establish such adjudication or to show that the witness, who was not confined at the time in an asylum, was, in fact, insane, and having failed to do either, and the trial court, on examination of such witness in open court as to his qualification to testify, having become satisfied of such qualification, did not commit error in permitting him to testify, particularly in view of the fact that his testimony was corroborated and showed him to be a competent witness.

5. ————: Improper Cross-Examination of Co-Defendant: No Objection by Defendant.  Where defendant made no objection at the trial to the cross-examination of a co-defendant, tried with him but not convicted, on the ground that such cross-examination was improper because upon matters not covered by the examination in chief and no valid objection of any kind was made to such cross-examination, defendant has no ground to complain, on appeal, of such cross-examination.

6. ————: Affidavits Filed in Supreme Court: Stricken from Files.  Where defendant filed with the clerk of the Supreme Court affidavits made after his appeal was taken and not incorporated in the bill of exceptions nor referred to in the motion for a new trial, such affidavits were no part of the record in the case and could not be considered for any purpose, and are ordered stricken from the files.

7. ————: No Errors: Judgment Affirmed.  The information was sufficient; the instructions given properly declared the law of the case; no error was committed during the trial, of which defendant could legally complain; but, on the contrary, he received a fair and impartial trial and was properly convicted on substantial evidence, and the judgment should be affirmed.

Appeal from Newton Circuit Court.—*Hon. Charles L. Henson,* Judge.

Affirmed.

*Charles E. Prettyman, Jr.,* for appellant.

(1). A person of unsound mind is incompetent to testify. Sec. 5418, R. S. 1919.  (2)  A party committed to the insane asylum is presumed to be insane, and continues to be insane until that insanity is overcome by testimony. State v. Vaughn, 223 Mo. 155.  (3)  Confinement in asylum

State v. Barker.

creates a presumption of insanity and must be overcome by evidence. State v. Herring, 268 Mo. 514. (4) The *voir dire* examination must show the witness competent to testify. State v. Herring, 268 Mo. 514. (5) Under the common law an insane witness is incompetent to testify. Coke Litt. 246 B; Livingston v. Kiersted, 10 Johns. (N. Y.) 362. (6) Upon a *voir dire* examination a witness charged as insane must show: First, mental appreciation of criminality of false swearing: second, that he knows that perjury is morally wrong, and that one committing it is liable to be punished under the criminal law; third, he must understand the nature of the oath. Where party has been committed to the insane asylum, the burden of proof is upon the party offering the witness to show the above facts. This was not done. State v. Herring, 268 Mo. 535. (7) The state must prove the defendant guilty beyond a reasonable doubt. State v. Miles, 174 Mo. App. 181. (8) Upon an entire failure of proof the Supreme Court will set aside the verdict, as proof of bias and prejudice of the jury. State v. Alexander, 184 Mo. 266. (9) Where jury decisions are reached by passion or prejudice the Supreme Court will set aside the verdict. State v. Williams, 191 Mo. 205; State v. Jones, 191 Mo. 653; State v. Dilts, 191 Mo. 665. (10) The cross-examination of defendant Massey was improper on matters not brought out in chief. State v. Williams, 186 Mo. 128; State v. Teasdale, 120 Mo. App. 692; State v. Cook, 112 S. W. 710; State v. Sharp, 233 Mo. 269; State v. Lynes, 194 Mo. App. 184; State v. Cole, 213 S. W. 110; Sec. 4036, R. S. 1919.

*Jesse W. Barrett,* Attorney-General, and *J. Henry Caruthers,* Special Assistant Attorney-General, for respondent.

(1) The information is good. Sec. 3230, R. S. 1919; State v. Ferguson, 212 S. W. 342; State v. Shelton, 122 S. W. 734. (2) The fact that a witness may have

294 Mo.—20

been adjudged insane is not a conclusive presumption that he is incompetent. A witness is competent if of sufficient mental capacity to understand the nature of an oath and to observe, recollect and narrate the things he saw and heard. Sec. 5418, R. S. 1919; State v. Herring, 268 Mo. 529. The issue of incompetency is for the trial court and its discretion will not be disturbed on appeal unless affirmatively shown to have been abused. State v. Jefferson, 77 Mo. 138; State v. Jeffries, 210 Mo. 326. (3) Where there is substantial evidence supporting the verdict of the jury, as in this case, this court will not interfere. State v. Fields, 234 Mo. 627; State v. Sharp, 233 Mo. 298; State v. Cannon, 232 Mo. 215. It is well settled that the court is not limited to the testimony offered by the adverse party, but will consider all the evidence in the case, in passing upon the sufficiency thereof to sustain the verdict. State v. Meagher, 49 Mo. App. 576; State v. Martin, 230 Mo. 700; State v. Lackey, 230 Mo. 720. Where the evidence is conflicting, it is for the jury to weigh and give such credit or reject the same as they see fit. State v. McKenzie, 177 Mo. 717; State v. Williams, 186 Mo. 135-8. (4) Appellant submits no proof by affidavit or otherwise showing that the verdict was the result of bias and prejudice, and this court will, therefore, not disturb the verdict on that ground. State v. Gonce, 87 Mo. 630; State v. Howell, 117 Mo. 342. (5) Unless the cross-examination violated some right of the appellant, the improper cross-examination of his co-defendant, Massey, if such was the case, could in no way operate to the prejudice of appellant, and he does not so complain or raise this point in his motion for a new trial, hence there is nothing before this court to review on that point. State v. McBrien, 265 Mo. 605.

RAILEY, C.—On October 10, 1921, the Prosecuting Attorney of Newton County, Missouri, filed, in the circuit court of said county, an information against Ollie Barker and Loren Massey, *alias* Shock Massey, charging them with first degree murder, in the shooting and kill-

ing of Homer Kingcade, in Newton County, aforesaid, on September 25, 1921.   On October 14, 1921, the prosecuting attorney, in behalf of the State, by leave of court, waived the charge of first degree murder against said defendants, and elected to try them for murder in the second degree.

Said defendants waived formal arraignment, and each entered a plea of not guilty.   The case was tried before a jury, and on October 15, 1921, the following verdict returned:

"We, the jury, find the defendant, Ollie Barker, guilty of murder in the second degree, and do assess his punishment at imprisonment in the penitentiary for twenty years, and we are unable to agree on the guilt or innocence of defendant Loren Massey.

"J. M. SPEAKS, Foreman."

Mrs. Lillie Kingcade testified that she was the wife of the deceased, Homer Kingcade; that she and her husband each carried a key to their residence; that defendant was related to her, and roomed at their place.

Ernest Brooks, who had lived in New Town many years, testified that he knew deceased and both defendants; that he saw Homer Kingcade in the evening, before he was killed that night; that Hunt's restaurant is across the street from the Knox store, north and west; that he saw deceased north of said restaurant, and he was alone; that he talked with deceased, and came back to the restaurant; that deceased went home; that he (witness) then went to the home of deceased, and found him there alone; that he went in and stayed there fifteen to twenty minutes; that deceased met some one back of the Knox barn, and stopped; that deceased was there quite a while and he (witness) heard him talking; that he (witness) met both defendants and they went in the direction of where deceased had stopped; that defendants talked with witness, then went toward Knox's store, stopped there for a second, and defendant Barker went on down to the house of deceased; that he stayed there a few seconds, came back to the Knox corner, called the

other defendant, but received no answer, and went down towards where deceased was standing; that the latter was across the alley talking to some boys, when Barker went to the house; that deceased had been standing there talking to these boys quite a while, before defendants reached the corner; that he could not understand what was said, but heard the voices of both Barker and deceased, and in a little while he heard two reports from a gun, but did not hear any other report; that it wasn't very long from the time Barker went to the house, until the shots were fired; that he started down in the direction of the shooting, and met defendant Barker, who told witness to come and see that he had shot deceased; that he (witness) asked Barker what he did it for, and defendant made no answer that he could understand; that he went down and found Homer Kingcade was dead; that during the afternoon, defendant Barker talked with witness about being locked out of deceased's house; that Barker asked him if he could get a room at the home of witness, as he had been locked out, and he was getting tired of it; that witness declined to let him have a room; that defendants had been drinking some that afternoon; that Ethel Barker—called Dinge—and Carl Martin were with defendants at different times that evening; that Homer Kingade had been to Joplin during the afternoon and did not appear to be drunk; that he talked good common sense.

On cross-examination, witness testified, that Homer Kingcade was a big, powerful man; that he and deceased were friends, and had been together a good deal; that he (witness) had been convicted of crime a few times.

George Yeadon, the sheriff of Newton County, testified that he was in Neosho the night that Homer Kingcade was killed, and heard of the killing about nine o'clock; that he went over to the scene of the killing, as soon as he could, with Austin and Jesse Saxton; that he found deceased lying in the street, dead; that he examined the clothes of deceased, to see if he had a weapon, but found nothing but a pocket knife, which

was in his little watch pocket, and was shut; that he found no other weapons on deceased; that he saw defendant Barker that night, after he was brought to the police station, and he looked like he had been drinking some; there was blood across the street to where deceased was lying.

On cross-examination, witness said he saw a big knife, a good ordinary knife, which he described above; that he thought deceased had on a coat, but was not certain; that the knife had two blades.

J. A. Bigham, an undertaker at Neosho, testified that he took charge of the body of Homer Kingcade, after he was killed; that he stripped off the clothing of deceased, which consisted of a pair of brown trousers, a pair of blue overalls over the trousers, and a brown hat; that he did not remember about deceased's shirt, but thought he had a coat; that he found one gunshot wound in the left arm; that it went into the fleshy part of the left arm in front; and the bullet could have hit the heart or one of the large arteries; that he found another wound in the fleshy part of the back, where it had gone in, and come out; that he could not tell which way the ball ranged that went into the shoulder; that it ranged from the left to the right side.

On cross-examination, witness said they found a knife in the watch-pocket of deceased, inside the overalls; that deceased was six feet, six and three-quarter inches tall; that he weighed from 260 to 265 pounds; that he was fully developed only above the waist; that deceased seemed to be a powerful, muscular man; that he never saw but one larger corpse; that the pocket knife of deceased was closed.

Mrs. Lizzie Moore testified that she lived a little south and west of the Knox store; that as she came home that night south of the store, she saw two men quarreling; that one of the men was pretty large; that she saw one boy coming towards the restaurant; that she heard that man say he would kill the other one if he didn't tell where she was; that the other man said "he didn't

know;" that the man who threatened to do the killing, said to the other fellow, "If you don't tell me where she is at I will kill you," etc.; that shortly after she got home, and went to bed, she heard the shooting; that she heard the shooting in about ten minutes after she heard the above talk; that there was a street lamp a little west of the restaurant; that four streets intersect there.

On cross-examination witness said she did not know who the men were that she heard quarreling.

Mr. John Joines testified that he was twenty-one years of age, and lived at Neosho; that he was with a girl down in New Town the night Homer Kingcade was killed; that he was west of the store, and heard a shot fired further down west in the street; that he saw about four people there; that one shot was fired and probably two right close together; that he saw the large man there, and he started north, kind of sideways to the man with the gun; that the man who was shot just walked a few steps before he fell; that witness saw him fall; that he was waiting outside for the girl to come back when he witnessed the above; that he was about twenty-five to thirty steps from said parties; that they were there when witness came.

On cross-examination he testified that he saw four men there; that he didn't pay any particular attention to what they were doing; that he could see the four men standing there; that the three shots were fired almost in quick succession; that he knew Carl Martin; that one man turned to get away after the first shot.

On re-examination witness testified that when the shot was fired the man doing the shooting and the man shot at were six or eight feet apart; that they were not in touching distance.

Mrs. Amanda Grant testified that she knew deceased and defendants; that on the night of the shooting she was about four blocks north of the Knox store; that she heard three shots in quick succession; that about twenty-five or thirty minutes before these shots were fired both

defendants passed the house where she was located, going south, toward the Knox store; that they used cuss words as they passed.

Mrs Becky Lane testified that she knew deceased and defendants; that on the night of the killing she was on Mrs. Grant's porch, with Mrs. Grant and Charley Frost; that she saw both defendants pass the Grant house going south; that as they passed, one of the defendants said, "I will kill him before morning;" he also said, "Son-of-a-b——;" that she did not know which one of the defendants made the above remarks; that they were "cussing" before they got to the house. -

On cross-examination witness testified that she was the aunt of deceased's wife, and had been living with her since the death of Homer Kingcade; that she told everyone who talked to her about it, that she heard these boys cursing as they passed.

Charley Frost was objected to by defendants as a competent witness, on the alleged ground that he had formerly been in the asylum and was not of sound mind. He was not in the asylum at this time. Defendants furnished no proper record evidence on the subject. The court then examined said witness as to his competency to testify, and found him to be competent. Said witness testified, in substance, that he knew deceased and defendants; that when Homer Kingcade was killed he (witness) was sitting on the Grant porch; that he heard three shots; that defendants went by the Grant house going south about thirty minutes before the shots were fired; that they said, as they passed the Grant house, they were going to kill the son-of-a-b——; that the above was all the swearing he heard.

Mr. Tilson Hawk testified that on the day of the killing he went with deceased and Frank McAlister to a ball game at Joplin; that they got back to Neosho some time after nine o'clock, and he left Homer Kingcade right there by the Knox store; that deceased was then sober.

Frank McAlister testified that deceased was sober when they got back from Joplin, but they had been drinking some.

This was all the testimony on the part of the State in chief. Defendant Barker interposed a demurrer to above evidence, which was overruled. A similar demurrer was offered in behalf of defendant Massey, which was likewise overruled.

Defendants offered in evidence a map, which is not set out as a part of the transcript herein.

Carl Martin testified that Homer Kingcade was from thirty-six to forty years of age when killed; that deceased was a large, powerful man; that he was present when deceased was shot; that both defendants were then present; that the shooting occurred between nine and ten o'clock at night in New Town, Neosho, Missouri; that he saw no one else around at that time; that he (witness) was talking to Homer Kingcade when both defendants came up; that they were south of the Knox store; that he (witness) had been talking with deceased about two or three minutes; that nothing was said there about any woman; that defendants approached from the north; that defendant Barker asked Kingcade if he had the key, and was told that he had it; that Barker then told him he wanted the key, and was told by Kingcade, he could not have it; that Barker then said, "All right you have the key in your pocket, Mr. Kingcade," and he said to the latter, "Keep it;" that when Barker said that, he turned and started to go back north; that Kingcade then struck at him with his left hand, and called him some kind of a name; that he followed Barker up when he struck at him, for a distance of about ten feet; that Kingcade and Barker were close together when the first shot was fired; that Barker was backing to the north, and said, "Don't do that, Homer;" that deceased had a knife in his hand, open, before defendants came up; that he did not know whether deceased had the knife in his hand when shot; that he was not paying attention; that Kingcade did not say anything to defendant Mas-

sey, nor did the latter speak to him; that Massey just stood there and did nothing.

On cross-examination, witness said that the two defendants and himself drank a pint of whiskey during the afternoon; that Barker, during the afternoon, complained that Kingcade had locked him out of the room; that he did not appear to know if deceased had the key, and then came where deceased was; that he (witness) never saw Barker's gun, but heard it and saw the fire; that Barker was in his shirt sleeves; that deceased was facing north when he struck at Barker, and the latter was facing south; that he did not see deceased with a knife when he was shot; that Barker asked him for the key, and a few seconds afterwards shot Kingcade.

Jim Brown testified that deceased asked Ern Brooks if he had been up to his (deceased's) house that day, and Brooks told him "that Ollie Barker went up there to get him a shave and the door was fastened;" that Kingcade then said "there was going to be hell there;" that this was ten or fifteen minutes before the killing.

Will Marshall testified, in substance, the same as Jim Brown, supra.

On cross-examination, this witness admitted that he had a criminal record.

Defendant Loren Massey testified that he was twenty-eight years old; that deceased was about forty years old, and was a large, powerful, muscular man, over six feet tall, and weighed 265 pounds stripped; that deceased was a boot-legger; that he was with Barker, and heard the latter ask deceased for the key, and Kingcade said, "I didn't have you locked out" and said to Barker that "Sis has got the key," and Barker went with deceased, down to the latter's house, and they came back together; that later he heard Barker ask Homer Kingcade for the key, and the latter said he had the key, but would not give it to him; that Barker then said, "All right, Mr. Homer, just keep the key;" that Barker started to walk away, and deceased stepped up and kicked him; that deceased rushed Barker, and the latter backed

away about twelve feet and shot him three times in quick succession; that he (witness), during the above performance, did not open his mouth.

On cross-examination, this witness also admitted he had a criminal record.

It appears from the testimony, that the knife of deceased was nine inches long and that the blade of same was four inches in length.

Several witnesses testified in behalf of defendants, that the general reputation of Homer Kingcade for being a peaceable and quiet citizen was not good.

Ollie Barker, one of the defendants herein, testified that he had lived with Homer Kingcade; that he had seen the latter carry a gun; that he did not make the statement testified to by Charley Frost; that he asked deceased if he had the key, and was told that he had it; that he then walked down to get the key from deceased, and was told he could not have it; that he (witness) then said, "All right, Mr. Kingcade, you have the key in your pocket, keep it;" that he (witness) then turned and deceased struck him and kicked him; that deceased struck at him, and he replied, "Don't do that, Homer," pulled his gun and fired; that he thought deceased was going to kill him; that deceased ran his hand in his pocket, and was mad; that he thought his life was in danger, grabbed the gun, and commenced shooting; that he ran back thirteen or fourteen feet, and deceased kept forcing him back; that he (witness) weighed about 150 pounds, and deceased about 270 or 275 pounds; that he (witness) was about five feet, five inches tall; that there was a scab on his leg, twenty days after the shooting, where deceased kicked him; that he would have run if he could.

On cross-examination, witness said that he and deceased had been friends, and he did not know why deceased struck him and kicked him. Witness testified:

"Q. When did you get the pistol? A. The pistol was at home. I had bought the pistol that morning from a hobo.

"Q. When did you get the pistol and put it in your pocket? A. I went home to get my key and I went to the house to get the key, and I couldn't get the key and I put it under the house."

Defendant Barker further testified that he got this gun from under the house where he had left it, put it in his pocket, and had it there when he took the same therefrom and shot deceased; that the gun was a 32 automatic; that as soon as he got the gun out of his pocket he commenced shooting; that deceased knocked the gun out of his hand after the shooting. This defendant likewise admitted he had a criminal record; that he put the gun under the house because he could not get in.

The foregoing covers substantially the testimony of the defendant.

The State introduced some rebuttal evidence relating to the matters heretofore set out.

The instructions and rulings of the court, as far as necessary, will be considered hereafter.

Defendant Barker filed motions for a new trial and in arrest of judgment. Both motions were overruled, and the court pronounced sentence on defendant and entered judgment in conformity to the terms of the verdict. Defendant, in due time, was granted an appeal, to this court.

The Newton County Circuit Clerk failed to make his transcript show that the bill of exceptions herein was signed by the trial judge, and filed in this cause. On suggestion of a diminution of the record here, the Attorney-General concedes that the original bill of exceptions was properly signed and filed. The clerk was likewise derelict in his duty in failing to make out and attach to his transcript sent here an index, although numerous witnesses were examined, and certain exhibits called for in the bill of exceptions.

I. Rule 19 of this court has been in existence a great many years, and will be found reported in the back part of our Supreme Court Reports. It provides that: "At-

torneys for appellants in criminal cases . . . shall . . . file in the office of the clerk of this court a . . . statement containing apt references to the pages of the transcript, with an assignment of errors and briefs of points and an argument." The above rule applies to typewritten briefs, as well as those which are printed. The typewritten brief filed by counsel for appellant in this case does not comply with the foregoing rule, either as to the statement of the case, or the assignment of errors. It not only fails to refer us to any portion of the record where the matters complained of can be found, but has submitted a transcript for our consideration, without an index, although it contains the testimony of numerous witnesses, and some exhibits. Under the uniform and established rulings of this court we could, by reason of the foregoing, with propriety, refuse to consider any of the questions discussed in appellant's brief. [State v. Stenzel, 220 S. W. l. c. (Mo.) 884; Christine v. Luyties, 280 Mo. l. c. 431, 217 S. W. l. c. 60; Hayes v. McLaughlin, 217 S. W. l. c. 264; Frick v. Insurance Co., 279 Mo. l. c. 157-8, 213 S. W. l. c. 855; Vahldick v. Vahldick, 264 Mo. l. c. 531-2-3, 175 S. W. l. c. 200; State v. Whitsett, 232 Mo. l. c. 529-30; State v. Holden, 203 Mo. l. c. 584; Cook v. City of St. Joseph, 220 S. W. (Mo.) l. c. 694; Reavis v. Butterworth, 228 S. W. (Mo.) l. c. 846.]

Under said authorities, we would be justified in ignoring the brief filed in behalf of appellant, yet, as we have carefully read the record and what has been said in the briefs of counsel, we will express our views of the law on the main issues in the case, as though a proper brief had been filed herein.

II. It is contended by appellant that at the conclusion of the State's testimony his demurrer thereto should have been sustained. The defendant failed to stand upon said demurrer, but presented to the jury evidence in his behalf.

*Failure to Comply with Rules.*

*Demurrer.*

In State v. Mann, 217 S. W. l. c. 69, we said: "In so doing he waived his right to be heard here on that subject, as the jury were then bound to consider the case with reference to all the testimony offered on both sides."

Many authorities are cited in support of above announcement of the law. To the same effect are the following authorities: State v. Belknap, 221 S. W. (Mo.) l. c. 45; State v. Lippman, 222 S. W. (Mo.) l. c. 439; State v. Ray, 225 S. W. l. c. 973; Burton v. Holman, 231 S. W. (Mo.) l. c. 633.

III.  We find upon examination of the record that appellant did not file a demurrer to the evidence at the conclusion of the whole case. Even if a demurrer had been filed, it would have been the plain duty of the court to overrule it, as there was substantial evidence offered, tending to show appellant's guilt.

At Close of Case.

IV.  In appellant's brief, his counsel has stated several abstract propositions of law in regard to insane persons not being able to testify. We are not referred in said brief to any part of the record relating to the ruling of the court, nor does the brief even mention the name of any insane person who testified in the case. After reading the record, it may be conjectured, that reference is intended to be made to the testimony of Charley Frost. When the latter was sworn and placed on the stand as a witness for the State, counsel for defendants objected to his competency, said he had been declared insane, and was not qualified to testify. Counsel for the State insisted that there was no proof of that fact. Thereupon counsel for defendants offered something, which he said was a part of the record of Newton County, Missouri, which was marked "Exhibit A," and called for in the bill of exceptions. It is not set out in the transcript, nor has counsel enlightened us as to its contents. Counsel for respondent said there was no record offered on the subject, and that "Exhibit

Insane Witness.

A," disclosed that the witness had been discharged. The court ruled that there was no adjudication shown in "Exhibit A." Counsel for defendant then asked the court to inquire into the sanity of said witness before he was permitted to testify. This seemed satisfactory to court and counsel, and witness was then temporarily withdrawn, and other evidence introduced. No exceptions were saved to above proceedings. Thereupon Charley Frost was recalled as a witness for the State, and counsel for defendants renewed his former objection. The court asked said counsel to produce the record, showing that witness had been declared insane, and he failed to do so. The court then interrogated said witness as to his qualifications to testify, and held that he was a competent witness. The court offered to permit counsel on both sides to examine the witness, but neither elected to do so.

In this case, the defendant failed to show that Frost had ever been adjudged to be insane, or that he was insane at the time of trial. He was not confined in an asylum and, hence, no presumption obtained that he was of unsound mind when offered as a witness. In addition to foregoing, the court became satisfied from an examination of the witness, that he was competent to testify. It is not shown that the court was guilty of an abuse of judicial discretion, in reaching the above conclusion.

In the case of State v. Herring and Baldwin, 268 Mo. l. c. 535, relied on by counsel for appellant, we said "that absent such confinement, or adjudication as an insane person, the burden of showing incompetency on account of unsoundness of mind is on him who objects on that ground."

The defendant signally failed to show by record or otherwise that Frost was not a competent witness. His testimony is corroborated by that of Mrs. Grant and Mrs. Lane, heretofore set out. His examination, as disclosed by the record, indicates that he knew what he was talking about, and was a competent witness in the case.

The foregoing contention is without merit from any viewpoint, and is overruled.

V. It is suggested in appellant's brief, that the cross-examination of defendant Massey, on alleged matters not brought out in chief, was improper. Massey was not convicted, nor is he here complaining as appellant. We are not pointed to any part of the record where an improper examination appears. Massey testified as a witness for the defense, and covered by his evidence in chief all the main questions in the case. His cross-examination related to the same matters. His testimony, on cross-examination, discloses on its face that no objection was made by counsel for defendants, on the theory that the matters therein referred to were not brought out or referred to in chief. Upon a careful examination of the record, we find that no valid objection of any kind was made to the cross-examination of defendant Massey.

**Co-defendant: Cross-examination.**

VI. Counsel for appellant filed with the clerk of this court the affidavits of Lizzie Moore et al., made since the appeal was taken in this case, which are not incorporated in the bill of exceptions, nor referred to in the motion for a new trial. These affidavits are no part of the record in this case, cannot be considered for any purpose, and are ordered stricken from the files. [Hunicke v. Meramec Quarry Co., 212 S. W. (Mo.) l. c. 348, and cases cited; Hoskins v. Nickols, 213 S. W. (Mo.) l. c. 839, and cases cited; State v. Baugh, 217 S. W. (Mo.) l. c. 280 and cases cited; State v. Stokes, 232 S. W. (Mo.) l. c. 112.]

**Affidavits in Supreme Court.**

VII. The information herein is sufficient; the instructions given, properly declare the law of the case, and no error was committed during the progress of the

**No Errors.** trial, of which appellant can legally complain. He received a fair and impartial trial, and was properly convicted upon substantial evidence.

The judgment below is accordingly affirmed. *Reeves, C.,* concurs; *White, C.,* not sitting.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur.