STATE v. KENNETH HOLLOWAY, Appellant.—No. 39759.—195 S. W (2d) 662.

Division One, July 8, 1946.

218

*Vernon Frieze* and *Lee Croak* for appellant.

*J. E. Taylor,* Attorney General, and *W. Brady Duncan,* Assistant Attorney General, for respondent.

DOUGLAS, J.—Kenneth Holloway, appellant, was convicted of murder in the first degree and sentenced to life imprisonment.

In September, 1944 appellant met Goldie Smith in Kansas City. They lived together as man and wife. They went together to Sedalia. They robbed a store at Lincoln in Benton County. On October 13, Goldie was arrested. She was placed in the county jail at Warsaw. Goldie was given the task of serving meals to the prisoners. In doing so she had the run of the jail and the sheriff's living quarters which occupied the adjoining building. On October 17 appellant was arrested and placed in the same jail. He was constantly confined in a cell in the jail proper. A few days later Buster Harold Goff was placed in the same jail on a charge of burglary and larceny. He was from time to time put to work in the sheriff's living quarters in the adjoining building. This gave him the freedom of the building.

Goldie and Buster testified for the State. From their testimony we get this story. Goldie had daily conversations with appellant. He told her he could not stand another term at the penitentiary and she should break him out of jail. Appellant also connived with Buster to help him escape. A plan was evolved for Goldie to give the sheriff knockout drops, obtain his keys and free appellant. Appellant's wife at his direction obtained some sleeping pills and gave them to Buster

who turned them over to Goldie. Goldie found out they were nothing but a form of aspirin so did not attempt to give them to the sheriff. Then appellant told Buster there was a machine gun hidden somewhere in the sheriff's living quarters on the second floor. They planned that when Buster worked there again he would get the machine gun and "put it on" the sheriff. Then Goldie would get the keys and let appellant out.

On the morning of November 1, the sheriff released Buster from his cell in order to clean up the sheriff's living quarters on the second floor and to do some repairs. The sheriff left the building. Buster found the machine gun. He told Goldie everything was ready for appellant's escape. While waiting for the sheriff's return he was experimenting with the machine gun and discharged it. Goldie came upstairs to ask what had happened. Buster told her, and she went to appellant and told him. Appellant replied he was all ready to go.

The plans were for Goldie to watch for the sheriff's return. If anyone accompanied him she would signal Buster by whistling twice. Buster, armed with the machine gun, would remain on the second floor in the living quarters, awaiting the sheriff. When the sheriff returned Goldie would follow him upstairs and when he was subdued by Buster with the machine gun, she would put handcuffs on him. Then Goldie would obtain the jail keys. She would go to the adjoining jail building carrying a food pan, as she was accustomed to do daily in carrying food to the prisoners, and would help appellant break out from his cell. Earlier in the day appellant had Goldie get an axe and place it by his cell to use in breaking the cell lock if necessary. Buster was to stand guard with the machine gun until appellant was released. Then the three of them would drive off in the sheriff's automobile to a designated place where appellant had arranged for another automobile to meet them.

In midafternoon the sheriff returned. He spoke to Goldie in the kitchen and told her he was going upstairs to see how Buster was getting along. Buster was concealed with the machine gun in the bedroom when the sheriff reached the second floor. Buster sprang out into a hall behind the sheriff, pointed the machine gun at him, had him turn around and walk backwards toward one of the bedroom doorways. When the sheriff came to the doorway he reached behind him for the door, slipped into the bedroom and slammed the door shut behind him. Buster ran to another door of the bedroom. The sheriff ran to the stairs. In the meantime Goldie had arrived with the handcuffs. In attempting to get away with Buster pursuing him the sheriff collided with Goldie as he reached the stairs. He was taking the first step down when Buster shot him three times in the back. He fell headfirst onto the stairs and died. Goldie and Buster jumped over his body and ran down the stairs. When they reached

the front door they saw people coming toward the jail. This caused them to give up their plan to release appellant. They escaped out of the kitchen door in the rear of the building. Goldie hurt her ankle after going a short distance and returned to the jail. Buster was picked up after several days. Buster testified appellant had agreed to give him $2,000 to help him escape. Both Buster and Goldie testified that on the day of the shooting they could have freely walked away from the building as they later did after the killing.

Appellant, Goldie and Buster were jointly charged with murder in the first degree. In this case appellant was separately tried and convicted. The evidence was sufficient to establish a common design to break jail. Knockout drops were the means first agreed on for subduing the sheriff. They are not ordinarily lethal but when they could not be obtained it was decided to use a machine gun instead. The common design to break jail was adhered to and followed, only the method of carrying it out was changed. There can be no question but that breaking jail by subduing the sheriff with a loaded machine gun is such a use of force that would naturally result in a killing, and such a killing would be in furtherance of the common design. Although the three may have believed they could cow the sheriff into submission by merely threatening him with the loaded machine gun, still if a killing resulted it would be a natural and probable consequence. Therefore appellant, although locked in his cell at the time the sheriff was killed in the adjoining building, is equally responsible for the killing. He comes under the rule that when one joins with another in a common design to commit an unlawful act in which homicide might be a natural and probable consequence, then such person will be responsible for the homicide whether he was present or not. State v. Powell, 339 Mo. 80, 95 S. W. (2d) 1186. And see State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750. And more particularly in point we find the general rule announced in 15 A. L. R. 456: "Where several persons conspire to escape, or to assist another in escaping, from jail, and agree, either expressly or by act or conduct, to use such force as is necessary to accomplish that purpose, and, in the furtherance of the common design, one of the conspirators commits murder, each is guilty of the same crime." See also Commonwealth v. Walters, 206 Ky. 162, 266 S. W. 1066; State v. Miller, 52 R. I. 440, 161 Atl. 222; Prather v. State, 76 Okla. Cr. 385, 137 P. (2d) 249.

Breaking jail is a felony. Sec. 4309 and 4310, R. S. 1939, Mo. R. S. A. But it is not one of the felonies named in the statute which makes a homicide committed in the perpetration thereof murder in the first degree. Section 4376, R. S. 1939, Mo. R. S. A., specifies only arson, rape, robbery, burglary and mayhem as such felonies. In State v. Lindsey, 333 Mo. 139, 62 S. W. (2d) 420 the court pointed out that a homicide committed while breaking jail is second degree

murder unless other facts independent of the felony of breaking jail show a willful, premeditated and deliberate killing. If so, the killing is murder in the first degree. In that case the court sustained a conviction of first degree murder because in addition to the jail breaking, there were present facts and circumstances showing first degree murder. Also in State v. Vaughan, 203 Mo. 663, 102 S. W. 644 it was held that the facts showed first degree murder in the killing of officers during an escape from the penitentiary. The facts in this case show a willful, premeditated and deliberate killing independent of the jail breaking. They sustain the conviction of first degree murder.

 Goldie and Buster were co-conspirators with appellant. Their testimony was competent in establishing the fact of the common design or conspiracy. A co-conspirator is an accomplice and is a competent witness. This is true even though the testimony of a co-conspirator is not corroborated. State v. Boesel (Mo.), 64 S. W. (2d) 243. In State v. Stogsdill, 324 Mo. 105, 23 S. W. (2d) 22 the court held the testimony of a co-conspirator was sufficient to establish a conspiracy. It is not necessary, as appellant would contend, to first establish a conspiracy by evidence other than the testimony of a co-conspirator, before a co-conspirator is competent to testify. The testimony of a co-conspirator is direct evidence of the fact of the conspiracy and is not within any rule requiring a conspiracy to be first shown as a prerequisite to its admissibility. See State v. Yates (Mo.), 252 S. W. 641.

 Conversations between Goldie and Buster were competent evidence against appellant although made outside of appellant's presence. The acts and declarations of conspirators in pursuance of the conspiracy are admissible against any member of the conspiracy. State v. Richetti, 342 Mo. 1015, 119 S. W. (2d) 330; State v. Short, 337 Mo. 1061, 87 S. W. (2d) 1031.

 Furthermore, proof that appellant and others conspired together to commit an unlawful act and that the killing occurred in furtherance of the conspiracy may be shown under an indictment or information charging first degree murder only. State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132, supra.

 Appellant on his direct testimony stated he had been twice before convicted and served terms in a penitentiary. On cross examination the state, over objection, elicited more details about such convictions. Having testified to these convictions on direct examination, appellant cannot object to such cross examination. See State v. Couch, 341 Mo. 1239, 111 S. W. (2d) 147. Even if appellant had not testified to such convictions on direct examination, they could be brought out on cross examination for the purpose of impeaching his credibility as a witness. Sec. 4081, R. S. 1939, Mo. R. S. A. Since a

defendant in a criminal case who takes the stand may be impeached as any other witness, it is not only proper to show he has been convicted but to show of what crime he has been convicted. State v. Ransom, 340 Mo. 165, 100 S. W. (2d) 294.

Appellant lodged with the clerk of this court after the appeal was taken an affidavit of Buster Goff to the effect that his testimony implicating appellant was not true. Such affidavit may not be considered in this case. State v. Barker, 294 Mo. 303, 242 S. W. 405.

What we have said above disposes of the relevant issues preserved for review by the motion for new trial. We find no reversible error in the record. Appellant had a fair trial and the verdict is sustained by the evidence.

Judgment affirmed. All concur.