STATE OF MISSOURI, Respondent, v. GEORGE WASHINGTON HARDY, Appellant, No. 44045—276 S. W. (2d) 90.

Court en Banc, March 14, 1955.

*Morris A. Shenker* and *William R. O'Toole* for appellant.

*John M. Dalton*, Attorney General, and *W. Don Kennedy*, Assistant Attorney General, for respondent.

[91]   HYDE, J.—Defendant was convicted of aiding and assisting in establishing a lottery as a business and avocation, in violation of Sec. 563.430 (statutory references are to RSMo and V.A.M.S.); and was sentenced to two years in the penitentiary.   Defendant has appealed.

Defendant alleges error in overruling his motion to suppress evidence, in receiving in evidence admissions made by him at the time of his arrest, and in refusing his motions for a directed verdict.   Defendant also complains of the argument to the jury by the State's attorney.

Defendant's motion to suppress evidence was to prevent the use in evidence of certain lottery paraphernalia in the hands of the police on the ground that it was seized by officers before defendant's arrest without a warrant, claiming the search and seizure was unreasonable, illegal and violative of Sec's. 15 and 19 of Article 1 of the Missouri Constitution.   Section 15 provides that the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and Section 19 provides that no person shall be compelled to testify against himself in a criminal cause.

The evidence on the motion to suppress was that defendant was arrested in a room [92] on the ground floor of a three story boarding house. (There was a sign on the house "Rooms for Rent".) The evidence was the testimony of the two arresting officers who watched the place from 9:15 to 9:45 P. M. and saw three men and a woman enter this room. The window shades, of the two windows of the room, were drawn but there was an L shaped tear in one of them and the officers could see through it into the room. They saw a woman seated on a chair looking at an open policy book with drawings in her hand. Defendant was standing near a table in the center of the room. One of the officers, with eight years of experience on the gambling squad, had seen numerous books of the same kind used for policy. The officers went into the common hallway of the boarding house and saw a man named Clarkson come out of the room with result drawings in his hand. He was arrested, the drawings seized, and the officers entered the room (where defendant was) through the door he had left open. Defendant was then arrested and the officers took from him ninety-nine policy result drawings marked IXL Class 5412; seven result drawings marked Class 5411; twenty carbon copies of policy writers' top sheets, Class 5412, an original take sheet, five policy hit slips and thirty-six dollars in money. These articles and the money were all in the waistband of defendant's trousers. Defendant made some statements to the officers after his arrest which will be referred to in considering the evidence on the merits. We considered similar contentions on a motion to suppress in State v. Humphrey, 358 Mo. 904, 217 S. W. (2d) 551. There, as here, the officers saw the policy papers before making the arrest. We held that St. Louis police officers could make a lawful arrest "when there are reasonable grounds to suspect that a misdemeanor has been committed" citing Hanser v. Bieber, 271 Mo. 326, 197 S. W. 68; Wehmeyer v. Mulvihill, 150 Mo. App. 197, 130 S. W. 681; Commission Row Club v. Lambert, (Mo. App.), 161 S. W. (2d) 732; that "when a person is lawfully arrested, the arresting officer may take from him articles of value as evidence", citing State v. Raines, 339 Mo. 884, 98 S. W. (2d) 580; State v. Williams, 328 Mo. 627, 14 S. W. (2d) 434; and that "as to the claim that the use of these policy slips in evidence violates the constitutional provision against self-incrimination, this has been ruled against defendant's contention", citing State v. Pomeroy, 130 Mo. 489, 32 S. W. 1002. (See also City of St. Louis v. Washington, (Mo. App.), 223 S. W. (2d) 858; City of St. Louis v. Simon, (Mo. App.), 223 S. W. (2d) 864.) Defendant relies mainly on State v. Dunivan, 217 Mo. App. 548, 269 S. W. 415 and State v. Owens, 302 Mo. 348, 259 S. W. 100. In those cases, the only basis for the search was suspicion and the facts were very different. In this case, the officers first saw the paraphernalia of the lottery and observed the actions of several persons in its use under

defendant's direction; and it may also be noted that a felony is herein involved. We hold that the Court properly overruled the motion to suppress.

Defendant's contention that he was entitled to a directed verdict (see S. C. Rule 26.10) depends upon his contentions that the motion to suppress should have been sustained and that the admissions he made at the time of his arrest were inadmissible because the corpus delicti had not been established. If the lottery paraphernalia taken at the time of defendant's arrest and the admissions he then made were admissible in evidence, it is obvious that a case for the jury as to defendant's guilt was made by the State. Defendant relies on the statements made in State v. Humphrey, 358 Mo. 504, 217 S. W. (2d) 551 and State v. Emerson, 318 Mo. 633, 1 S. W. (2d) 109, that "The two elements necessary to prove the corpus delicti of a lottery (in violation of Section 563.430) are: (1) the establishing of a lottery by someone, (2) that the person charged aided or assisted in making or establishing it." This statement is incorrect and the rulings in those two cases to that effect should be and are hereby overruled. As pointed out in State v. Price, 361 Mo. 1034, 238 S. W. (2d) 397, it would have been correct in those two cases to have said: "that the two elements above quoted were necessary to establish guilt of the defendant [93] rather than that they were necessary to establish corpus delicti." We stated the correct rule in the Price case as follows: "In this state the corpus delicti has never been construed to require or consist of more than these two elements: (1) Proof, direct or circumstantial, that the specific loss or injury charged occurred; (2) someone's criminality as the cause of the loss or injury. Or tersely, (1) the act; (2) the criminal agency of the act (other than the accused's confession.) * * * But, once evidence other than the defendant's confession shows that the specific crime charged was committed by someone, then defendant's confession is admissible and, of course, if believed completes the case." (See also State v. Skibiski, 245 Mo. 459, 150 S. W. 1038; State v. Saussele, (Mo. Sup.), 265 S. W. (2d) 290.) Thus, while it is essential that there be at least circumstantial evidence of the existence of a lottery, it is not necessary to prove the corpus delicti to show that the person charged aided or assisted in making or establishing it. Therefore, when the evidence is sufficient to show the act and the criminal agency of the act (the existence of a lottery and assistance of someone in operating it), then the confession of the defendant is admissible to show the second element necessary to establish his guilt, namely: that the defendant aided or assisted in making or establishing the lottery and also that he did so as a business or avocation.

In addition to the facts shown on the motion to suppress, hereinabove stated, which were repeated in the trial on the merits, one of the officers, Sergeant Bloecher, testified as an expert on policy

operations, showing how the game was played and the paraphernalia used. Bets were made through policy writers who recorded numbers chosen by the bettors in a book, making an original and two carbon copies. These were called top sheets and they were identified by the writer's book number and also a class number indicating the particular drawing in which the bettor would participate. The policy writers would go to the manager and give him two copies, keeping the other in the book. They would also give the manager the money to cover the bets less the writer's commission. The manager listed the bets on a take sheet and turned it over with the top sheets to a "pick up man" for the operator of the lottery, retaining a copy of the take sheet and the money. The "pick up man" would deliver these to the operator of the policy company and get the result drawings from him, or his "cut loose man", showing the winning numbers in the drawing. These result drawings showed the name of the company and the class number indicating the time of day of the drawing, using odd numbers for the morning drawing and even numbers for the evening drawing. (For a description of these result drawings, also called result ballots, see City of St. Louis v. Washington, 223 S. W. (2d), l.c. 860.) The "pick up man" would bring these result drawings back to the manager, who distributed them to the writers and they distributed them to the players. The writers would pay the winners of small amounts; apparently large winners collected through the manager. When one of the writers' bettors had a winning number, the writer would prepare a hit slip showing his book number, the class number and the amount of money won. He would turn this over to the manager and get the money to pay it. These hit slips were taken by the "pick up man" to the operator of the company. Sergeant Bloecher said (based on his experience and knowledge of policy operations) that the presence of the carbon copy top sheets indicated that the policy writers had turned in the bets they had recorded for drawing 5412; that the presence of the result drawings indicated that the drawing was held, the lottery completed, and that the winning numbers for drawing 5412 were those shown thereon; that the presence of the take sheet indicated that the writers whose book numbers were listed on it had turned in the amounts of money shown for bets on that drawing; and that the presence of the hit slips indicated that writers had wins on their books in the amounts shown on the slips. He also said that, after a drawing was held, the manager would have the carbon copy top sheets, the result drawings, the take sheet and the hit slips.

[94] The money and lottery papers taken from the waistband of defendant's trousers were in a leather pouch. These papers showed a total amount of bets of $85.00 turned in for this particular drawing. There were also 78 result drawings on the floor of the room, having various class numbers, which were picked up by one of the officers. After his arrest defendant said "they had just started again and

he had been going about two weeks, that they have two drawings a day, at twelve noon and at eight p.m. He works on a commission but he wouldn't state how much commission and he said the top sheets and the money seized from him had been turned in to him by the writers for tonight's drawing; also, the result drawings marked 5412 were for the eight o'clock drawing that evening. * * * He said that the sheets that he had and the money, had been turned in to him by the writers.''

Our conclusion about this evidence is that (without defendant's admissions) it was sufficient substantial circumstantial evidence to show that a lottery had been established by someone and also that defendant aided and assisted in it as a manager, collecting bets from policy writers, sending them in to the operator, distributing the drawing results and arranging payment of bets on winning numbers. This evidence was also sufficient to show defendant was doing this as a business or avocation. This evidence was much more comprehensive and substantial than that in State v. Jackson, (Mo. App.), 220 S. W. (2d) 779, cited by defendant, where only possession of a policy writer's book was shown, and that in State v. Humphrey, supra, where only possession of top sheets and result ballots was shown (217 S. W. (2d), l.c. 552) likewise by one who may have been a policy writer but apparently not a manager. In this case, the corpus delicti was amply proved, making defendant's admissions clearly admissible. These admissions were certainly sufficient to complete the case against him, if anything more was needed. We, therefore, hold that the court properly overruled defendant's requests for a judgment of acquittal.

Defendant's final contention is that the argument to the jury by the State's attorney was speculative, beyond the scope of the evidence and inflammatory; and also constituted a comment on defendant's failure to testify. The State's attorney taking the figure of $85.00, listed as bets on the top sheets for the drawing on the evening of his arrest, said this would amount to $170.00 per day and $61,888.00 for a year, and stated that defendant was the core and wheel of an operation amounting to $61,000.00 per year. He further stated: ''He wants you to believe that we are talking about a penny ante game. We are not. We are talking about big business; we are talking about the hard earnings of people, human beings, like you and I, whose livelihood, whose bread money, whose butter money is taken by vultures like this.'' Defendant cites State v. Burns, 286 Mo. 665, 228 S. W. 776; State v. Campbell, (Mo. App.), 278 S. W. 1051; State v. Taylor, 320 Mo. 417, 8 S. W. (2d) 29; State v. Florian, 355 Mo. 1169, 200 S. W. (2d) 64; and 23 C.J.S. 542, stating the duty of the prosecutor to try the defendant fairly and impartially, to refrain from applying unbecoming names and epithets to him and to confine himself to the evidence and fair and reasonable deductions and conclusions to be drawn therefrom. However, considering the evi-

dence as to the nature and operation of the policy game, we do not think the calculations made in the argument can be held to be without any reasonable basis, especially since the method of calculation was stated.  Moreover, they were made partly in answer to the argument of defendant's counsel that ''we are not talking here about a man running a big policy operation, getting a big income from it, or anything of that sort.''  We have said: ''Applying unbecoming names or epithets to a man or woman on trial is never excusable.  This court has always looked with disfavor on this kind of conduct on the part of a prosecutor and in many instances held such conduct sufficiently prejudicial to constitute reversible error.  However, this is a question which must, in each instance, be considered in connection with the nature of the [95] case, all the facts and circumstances in evidence, and all of the incidents of the trial including the conduct of defending counsel.''  (State v. Harmon, 317 Mo. 354, 296 S. W. 397; see also State v. Mangercino, 325 Mo. 794, 30 S. W. (2d) 763; State v. Vallo, (Mo. Sup.), 33 S. W. (2d) 899; State v. Wilkins, (Mo. Sup.), 100 S. W. (2d) 889; State v. Sanchez, (Mo. Sup.), 269 S. W. (2d) 46.)  However, the term ''vulture'' was used in describing the operations in which defendant was engaged and we think the jury would so understand it.  Under all the circumstances, our conclusion is that this does not require a reversal.

Defendant's further contention that the State's argument constituted a comment on defendant's failure to testify in violation of Section 546.270, likewise cannot be sustained.  The State's attorney said: ''Look at the evidence on the State's side of the scale.  On the defendant's side is nothing.''  He also, on three occasions, referred to the State's evidence as ''uncontradicted.''  We have held in State v. Johnson, 362 Mo. 833, 245 S. W. (2d) 43; State v. Spradlin, 363 Mo. 940, 254 S. W. (2d) 660; and State v. Hayzlett, (Mo. Sup.), 265 S. W. (2d) 321 that statements similar to the one above quoted did not constitute a violation of the statute.  We have also consistently held that it was not a violation of the statute to state that evidence was uncontradicted, undisputed or uncontroverted.  (State v. Ruck, 194 Mo. 416, 92 S. W. 706; State v. Fields, 234 Mo. 615, 138 S. W. 518; State v. Gordon, 253 Mo. 510, 161 S. W. 721; State v. Hughes, 258 Mo. 264, 167 S. W. 529; State v. Steele, 280 Mo. 63, 217 S. W. 80; State v. Butler, (Mo. Sup.), 221 S. W. (2d) 160.)  In this case, it appears there were other persons in the room with defendant, who could have testified, so the statement did not necessarily refer to defendant.  (See State v. McKeever, 339 Mo. 1066, 101 S. W. (2d) 22, 32.)  The rulings in the above cited cases are recognized by defendant but it is said that this matter was overemphasized by being repeated.  While undue repetition might have been ground for action by the trial court, if deemed prejudicial, it was presented to the trial court in defendant's motion for new trial

and overruled. "Whether or not a particular improper argument is so prejudicial under the facts in the particular case, as to necessitate a reprimand of counsel or a discharge of the jury, is largely within the discretion of the trial court. An appellate court will not interfere unless the record shows that the trial court abused its discretion to the prejudice of the appellant." (State v. Tiedt, 360 Mo. 594, 229 S. W. (2d) 582, 588.) We cannot find an abuse of discretion in this case.

The judgment is affirmed.

*Leedy*, C.J., *Dalton, Hollingsworth, Ellison* and *Westhues*, JJ., and *Cave*, Special Judge, concur.