**STATE of Missouri, Respondent,**

**v.**

**Grace DEYO, Appellant.**

**No. 49085.**

Supreme Court of Missouri,

Division No. 2.

July 16, 1962.

Edward R. Boyle, Boyle & Schuler, Clear Lake, Iowa, Clyde Rogers, Gainesville, for appellant.

Thomas F. Eagleton, Atty. Gen., James J. Murphy, Asst. Atty. Gen., Jefferson City, for respondent.

BOHLING, Commissioner.

Grace Deyo, appellant, and one Bill Shindler, in an information filed in Ozark County, were charged jointly with the murder in the first degree of Kenneth V. Deyo, the husband of said Grace Deyo, on or about July 28, 1959, by poison. There was a severance and, upon trial, Honorable Douglas W. Greene, Judge of the Circuit Court of Greene County, presiding upon transfer, appellant was convicted and sentenced to life imprisonment. She appeals.

Mr. and Mrs. Deyo, with their three children, lived in the Almartha neighborhood, Ozark County, Missouri, near the Douglas County line. A brief outline of the State's theory, as developed by its evidence and based upon a conspiracy between appellant and Shindler, may aid in a more ready understanding of the case. The facts that are made issues for review are developed hereinafter. Bill Shindler and Mrs. Deyo indulged in sexual relations. Mr. Deyo's practice was to take a vitamin before retiring. Bill Shindler placed a capsule containing strychnine in the bottle containing Deyo's vitamins. Around 8:00 or 8:30 p. m., July 27, 1959, Mr. Deyo took a capsule from his vitamin bottle, soon thereafter became sick, and died about midnight. The toxicological and pathological examinations of his body disclosed that Mr. Deyo's death was due to acute poisoning by strychnine.

Appellant did not testify. She adduced evidence for the purpose of establishing that her confession was involuntary.

I. The prosecuting attorney in his opening statement referred to facts contained in a written statement given by the appellant to Sheriff George A. Rose of Ozark County (who at the time had a warrant for appellant's arrest) and Trooper John R. Teichman of the Missouri State Highway Patrol at Mason City, Iowa, on October 1, 1959, appellant having moved to Clear Lake, Iowa, following Mr. Deyo's death. The court, at appellant's request, held a preliminary hearing on whether appellant's statement was voluntarily given. Appellant's position was that the State had the burden of establishing the voluntariness of the statement, and appellant had the right to cross-examine and introduce her own evidence. The court's view was that the statement was presumptively voluntary; and appellant, proceeding under this ruling, called Officers Rose and Teichman to the stand. They were the only witnesses on the issue and, without detailing it, their testimony established that appellant's statement was voluntarily given, without threats or promises and that appellant was alert and wanted to talk. Appellant read, corrected in her handwriting, and signed the statement. About five minutes later she was placed under arrest. Appellant, in her brief, admits that later at the trial before the jury the testimony of Rose and Teichman as witnesses for the State was the same as their testimony at the preliminary hearing.

The State in its brief concedes appellant's point that the court erred in placing the burden on appellant at the preliminary hearing of proving her statement was involuntary, but contends this error was not prejudicial as said issue was properly developed before and submitted to the jury at the trial on the merits. See with respect to the State having the burden of proof: 23 C.J.S. Criminal Law § 835, p. 247, note 52, stating Missouri holdings and citing, among others, State v. Williamson, 339 Mo. 1038, 99 S.W.2d 76, 81[8, 9]; State v. Bradford, Mo., 262 S.W.2d 584, 586 [1–5]; State v. Di Stefano, Mo., 152 S.W.2d 20 [2–4].

It is stated in State v. Humphrey, 357 Mo. 824, 210 S.W.2d 1002, 1004 [6], that when the court admits a confession "the

matter of whether or not it was shown to be involuntary must be determined on appeal from all the evidence both at the preliminary hearing and before the jury * * *. [Citing cases.]" See also State v. Thomas, 250 Mo. 189, 157 S.W. 330 [9]; State v. Menz, 341 Mo. 74, 106 S.W.2d 440, 450 [13]; State v. Statler, Mo., 331 S.W.2d 526, 530 [9].

■ In view of the presentation of the evidence before the jury by the State and by the appellant on whether appellant's confession was voluntary or involuntary and instructions of the court on said issue and that the burden rested upon the State to establish appellant's guilt beyond a reasonable doubt, no prejudicial error resulted in the case at bar from the court's placing the burden on appellant at the preliminary hearing out of the presence of the jury.

■ II. Appellant contends that error was committed in admitting the statements of appellant in evidence before the corpus delicti was proved and in overruling appellant's motions for judgment of acquittal. The motion at the close of the State's case was waived by appellant's introduction of evidence. State v. McMillian, Mo., 338 S.W.2d 838, 842 [1].

■ In ruling the motion at the close of all the evidence the probative evidence favorable to the State is taken as true, as are all the legitimate inferences to be deduced therefrom, and all evidence and inferences contrary thereto are disregarded. See McMillian, supra, and State v. Truster, Mo., 334 S.W.2d 104, 107.

■ " 'In a homicide case the corpus delicti consists of two elements, first, the death of a human being and, second, the criminal agency of another in causing the death.' " State v. Morris, Mo., 307 S.W.2d 667, 673, quoting State v. Meidle, Mo., 202 S.W.2d 79, 81 (cases cited by appellant). See 41 C.J.S. Homicide § 312, p. 6; State v. Truster, supra. Proof that the accused was

criminally liable is not an element of the corpus delicti; but is required to convict the accused. State v. O'Kelley, Mo., 213 S.W.2d 963, 966 [2]; State v. Hardy, 365 Mo. 107, 276 S.W.2d 90, 93; the Morris and Meidle cases, supra.

■ The following is quoted and applied in State v. Haun, Mo., 324 S.W.2d 679, 681 [1]: " 'It is established law in Missouri that when the corpus delicti has not been sufficiently proven, an uncorroborated extrajudicial confession of guilt cannot be regarded as evidence tending to show guilt. * * * Yet this rule does not require full proof of the body of the offense, independent of the confession. If there is evidence of corroborating circumstances independent of the confession, which tends to prove the offense by confirming matters related in the confession, both the corroborating circumstances and the confession may be considered in determining whether or not the corpus delicti has been established.' " See also State v. Skibiski, 245 Mo. 459, 463, 150 S.W. 1038, 1039 [1], a frequently-quoted case; State v. Kollenborn, Mo., 304 S.W.2d 855, 858; State v. Truster, Mo., supra. We have said only slight corroborating facts have been held sufficient (see State v. Truster, supra, citing cases), and, notwithstanding the general practice, it is not essential that the independent proof of the corpus delicti come first in the order of proof (State v. Arndt, Mo., 143 S.W.2d 286 [3, 4]; State v. Rohman, Mo., 261 S.W.2d 69, 73 [13]). See C.J.S. Criminal Law §§ 730, c; 1046.

The corroborating circumstances in this record independent of appellant's statements confirm the matters related in her statements and both the corroborating circumstances and appellant's statements are for consideration.

Appellant's statement was introduced in evidence before the jury during the examination of Trooper Teichman and after proof of the corpus delicti. We set it forth here for better understanding of this issue. It is in narrative form; that is,

a question would be asked and the answer typed in the narrative. With the exception of the first and last two paragraphs, everything in the statement is appellant's narration of the facts. Appellant read the statement, corrected it in one place, and then signed it. Omitting the caption and signature, the statement reads:

"This statement is made in the presence of Sheriff George Rose of Ozark County Missouri, and to Trooper John Teichman of the Missouri Highway Patrol. It is made to these persons, without any threat or promise, and I understand that it may be used either for or against me in a Court of Law.

"My name is Grace Marie Deyo. I am 43 years old. I was born on January 6, 1917 at Clear Lake, Iowa. I am the widow of Kenneth Virgil Deyo, and have 3 children. Their names are, Doris Jean, age 10, Diana Marie, age 4, and Dorothy May Miller, age 20, who lives in Houston, Missouri. At the present time, I am living at RFD #2 Clear Lake, Iowa.

"At approximately August 1958, Bill Shindler started coming around my home at Almartha, Missouri. He first came there to look at our cattle, to see about buying some. Shindler returned to the farm several times since then, during which times, he and I had sexual relations. One of the neighbors told my husband about these visits of Shindler, and Kenneth and him had an argument about it. Bill told me that Kenny had lit into him about it.

"Around April 1959, Bill suggested that he would take Kenny out into the woods and shoot him, because he didn't like the way he was treating me and the kids. I told Bill that he couldn't get away with it, and he didn't say any more about it. Later on, Bill went up to see John Hodges, to see about getting some strychnine poison for him. That was around May sometime. Hodges was the one who told him about it. I don't know if he was going to get it for Bill or not.

"Several weeks before Kenny died, Bill Shindler showed me a small bottle that had a label stating the bottle contained strychnine. He said that he got some fellow in Gainesville to take him to Mountain Home, Arkansas to get it. I had told him that Kenny was taking Vitamin tablets, and he said he would put some of the poison in some capsules and put them in the bottle where Kenny kept his Vitamins. Bill showed me some brown capsules, that he said he was going to put the poison in. They looked just like the ones Kenny was taking. Bill told me that he was going to put the capsule with the poison in it, back into the bottle of Vitamins. I don't know when he did this, but I did know he was going to do it.

"Kenny would take his Vitamins just before he went to bed every night. On July 27, 1959, at approximately 6:30 P.M., we had our supper. I think that Kenny took his Vitamin around 8 or 8:30 P.M. We sat up and watched the News on TV and then Kenny got sick. He complained of a lot of pain in his left arm and side, and said he thought he was having a heart attack or a stroke. In a short time, he just slid out of the chair and laid on the floor. I thought he might have gotten the pill with the poison in it, but I wasn't sure, because he said he thought he was having a heart attack. I didn't know for sure, because I didn't know how strychnine acted. He laid on the floor until about midnight, when I felt his pulse and believed he was dead. I had wanted to go get a Doctor, but he wouldn't let me leave him. When I knew he was dead, I went down to Howard Plasters to get help.

"I haven't seen Bill Shindler since Kenny's death, but he had been around my home with other people there. I had a sale August 10, 1959, and then came to Clear Lake, Iowa with my folks. They didn't want me to live down there alone.

"I do remember Bill telling me about this fellow who is supposed to have taken him to Mountain Home, that he had gotten

rid of his wife the same way. I don't re-call Bill ever saying who this fellow was.

"I have read the above statement con-sisting of one (1) typewritten page, and it is the truth to the best of my knowledge.

"Signed this 1st day of October, 1959 at the Sheriff's Office in Mason City Iowa, in the presence of the above named Officers."

Bill Shindler and Mrs. Deyo had in-dulged in sexual relations. Deyo's custom was to take a vitamin before retiring. Around 8:00 or 8:30 p. m. July 27, 1959, Deyo took a capsule from his vitamin bottle, soon thereafter became sick, and died about midnight. His body was taken to the Clinkingbeard Funeral Home in Ava. On July 29, Mrs. Deyo authorized an au-topsy to be performed upon the body. Dr. Harvey S. Smith, pathologist at the Burge Hospital in Springfield, performed a com-plete autopsy. Dr. Smith described Mr. Deyo's body as that of a reasonably young man, well-nourished and heavily muscled; and stated Mr. Deyo's death was not caused by heart attack, physical injuries or disease. He was unable to determine any cause for the death. He took portions of the brain, liver and kidneys and all the material he could obtain from the stomach and pre-pared them to be sent for toxicological ex-amination. These specimens were deliver-ed to Lieutenant James Rhodes, chemist in charge of the technical laboratory of the Missouri State Highway Patrol in Jeffer-son City. Lieutenant Rhodes' tests resulted in his recovery of certain stated quantities of strychnine from these specimens. Dr. Smith, recalled, testified in answer to a hypothetical question that, upon the basis of his findings and those of Lieutenant Rhodes, he was of the opinion, based upon reasonable medical certainty, that Mr. Deyo's death was due to acute poisoning by strychnine. A legitimate inference from this record is that Bill Shindler placed a strychnine capsule, looking just like the ones Mr. Deyo was taking, in the bottle containing Mr. Deyo's vitamins.

Appellant's belief that Mr. Deyo had a heart attack or might have taken the pur-ported vitamin with poison and the fact that he was a reasonably young, well-nourished, healthy, and heavily muscled man warranted a finding he did not commit suicide.

■■ In State v. Taylor, Mo., 190 S.W. 330, 333 [5], it was contended the corpus delicti was not established, there being no direct evidence of the administration of the poison. We said: "Notwithstanding the absence of this character of proof, there was evidence of a succession of facts which when considered in the order of their occurrence are of strong probative force." One placing poison for another who unknowingly takes it may be convicted as principal in the first degree. State v. Fulkerson, 61 N.C. 233. See 22 C.J.S. Criminal Law § 83, p. 245, note 5; 40 C.J.S. Homicide § 11, p. 853, note 84. Dictum in Pierce v. State, 130 Tenn. 24, 42, 168 S.W. 851, 855, Ann.Cas.1916B, 137, 142, well states this law: " * * * in case of murder by poisoning, one might be a principal felon by preparing and laying the poison or per-suading another to drink it who was ignor-ant of its poisonous quality, or by so ar-ranging that one would take poison in the absence of the actor."

There was sufficient proof of the corpus delicti.

■ III. Appellant contends there was no evidence of a conspiracy between appel-lant and Bill Shindler; reasoning that "mere knowledge and acquiescence are not sufficient to prove conspiracy or that ap-pellant, who knew and acquiesced in the commission of a crime, is guilty." Appel-lant's cases are State v. Larkin, 250 Mo. 218, 157 S.W. 600, 603 [2, 3], 46 L.R.A., N.S., 13; State v. Mathis, Mo.App., 129 S.W.2d 20, 22 [2]; State v. Thompson, 293 Mo. 116, 238 S.W. 786 [2]. In the Larkin case, closest in point of fact to the case at bar, one Harris worked on the night shift. On the night in question he left

home at 9:00 p. m., as usual, but soon returned, surprising his wife and Larkin under a tree. Harris threatened to kill and shot at Larkin, who ran and, having a revolver, returned the fire, killing Harris. Tried jointly, Mrs. Harris and Larkin each received terms of ten years' imprisonment. Mrs. Harris, although present, did not participate in any physical manner whatever in the shooting and killing of her husband. The court stated: "[W]e need not cite authorities that mere presence at the scene of a killing without more does not constitute that aiding, abetting, assisting, encouraging, or advising such killing required by the law to constitute guilt." A conspiracy betwen Mrs. Harris and Larkin to kill Mr. Harris does not appear to be an issue in the case. We do not develop the facts in the Mathis and Thompson cases as we are of opinion there is much stronger evidence of a conspiracy in the case at bar than in any of appellant's cases.

The following, omitting citations, is quoted with approval in State v. Menz, 341 Mo. 74, 106 S.W.2d 440, 448: "'"A conspiracy, like any other fact, may be shown by circumstantial evidence; it is not necessary to prove by direct evidence an agreement to commit a crime in order to establish a conspiracy. * * * Because of the difficulty of procuring direct evidence, generally it must be shown by circumstances." * * *

"'"* * * It is not necessary to prove that parties who engage in a common enterprise to commit a crime made a definite agreement before committing the crime." * * *'" State v. Williams, 356 Mo. 1048, 204 S.W.2d 748, 749 [2-4].

■ A jury can believe or reject all or any part of an accused's statement, confession or testimony. The jury did not have to believe appellant's self-serving statements. State v. Hill, Mo., 328 S.W.2d 656, 659 [3].

The evidence most favorable to the State and the legitimate inferences therefrom justified, we think, the following findings by the jury. The motive for doing away with Mr. Deyo, referred to as Kenny by appellant, is found in appellant's sexual relations with Bill Shindler. Discussions between appellant and Shindler about getting Kenny out of the way started in April, 1959, Shindler suggesting taking Kenny out in the woods and shooting him and appellant advising Shindler "he couldn't get away with it." There is no evidence that she told him not to kill her husband or that she warned her husband. Appellant stated Shindler went to John Hodges in May to get strychnine. She does not state how she knew this. Several weeks before Kenny died Shindler showed appellant a small bottle labeled strychnine, and told her "he would put some of the poison in some capsules and put them in the bottle where Kenny kept his Vitamins." She "had told" Shindler "Kenny was taking Vitamin tablets" and the jury could infer that appellant showed Shindler Kenny's vitamins, as Shindler procured capsules (not tablets) which were brown and "looked just like the ones Kenny was taking." Shindler said he was going to put the capsule with the poison in it back into the bottle of vitamins. She didn't know when he did this but knew he was going to do it. The jury could find that appellant admitted Shindler to the Deyo home; that transactions and discussions betwen appellant and Shindler occurred there, and appellant permitted him to make use of the bottle containing Kenny's vitamins. Kenny took his vitamin around 8:00 or 8:30, July 27. After watching the news on television, Kenny got sick, complained of a lot of pain, slid out of his chair in a short time and lay on the floor. Appellant "thought he might have gotten the pill with the poison in it." Kenny "laid on the floor until about midnight, when I felt his pulse and believed he was dead." When she "knew he was dead" she went for help. Appellant had a sale August 10, 1959, and then went to Clear Lake, Iowa, with her folks.

Trooper John R. Teichman and Deputy Sheriff Bill Bonnell (who died before the

trial) went to the Deyo home to investigate. Teichman, omitting some facts covered by other evidence, testified that appellant said she thought her husband had a heart attack. When he asked about Mr. Deyo's taking vitamins, appellant stated she didn't know what they were. After he described them, she went to the kitchen, returned with two vitamins, stated Mr. Deyo took one daily before retiring and had taken one that night. He asked appellant if she would consent to an autopsy and "she said, no, definitely not, she didn't want her man cut up." Teichman's testimony was that this talk with appellant was on the night of July 28th or 29th, but he testified appellant told him it was the night after Mr. Deyo's death, which would be July 28th, and that she did not tell him she had already consented to an autopsy. Her consent for an autopsy is dated July 29, 1959.

George A. Rose, Sheriff of Ozark County, upon his return from a trip, talked to Mrs. Deyo in July, 1959. He testified, among other things, that appellant said Bill Shindler and she "didn't have any relations, didn't mean anything to each other." His investigation failed to disclose any sale of strychnine to Bill Shindler or Mrs. Deyo.

The jury could find Teichman's investigation was on the night of July 28th; that appellant was attempting to conceal her knowledge of the vitamins and Kenny's daily use of them, and that her objection to an autopsy was based on fear of what it might reveal. She also was concealing material facts in her later interview with Sheriff Rose. The jury could also reason from the facts of record that appellant was not a mere passive looker-on in the transactions leading to her husband's death; that her actions and discussions with Shindler imparted to him her co-operation and gave him confidence he could rid them of Mr. Deyo by placing the poison where Mr. Deyo would unknowingly take it in his absence. A word from appellant to her husband would have prevented his death. The

jury could also find, following Mr. Deyo's death, from appellant's statements she thought her husband died of a heart attack, from her refusal at first to consent to an autopsy, and from her denial of improper relations with Shindler that these statements and actions were in furtherance of the conspiracy and understanding and the community of purpose she had with Shindler.

IV. Appellant says her motion for judgment of acquittal should have been sustained because "there was no evidence in the case of any overt act on the part of the appellant." Briefly, appellant cites State v. Davis, 319 Mo. 1222, 6 S.W.2d 609, and State v. Lourie, Mo., 12 S.W.2d 43, companion cases, separately tried, where defendants were jointly charged "with an attempt to commit murder in the first degree" under RSMo1919, § 3683 (now RSMo 1959, § 556.150, V.A.M.S.), which required the doing of an "act toward the commission of" the offense.

Appellant stood charged with murder in the first degree. Having conspired with Shindler she became an accessory before the fact (40 C.J.S. Homicide § 9, p. 836, note 78; 22 C.J.S. Criminal Law § 90, p. 268; State v. Stidham, Mo., 305 S.W.2d 7, 15; State v. Mason, 322 Mo. 194, 14 S.W.2d 611, 616 [13]) to the murder of her husband and under § 556.170, RSMo1959, V.A.M.S., could "be charged, tried, convicted and punished" as a principal in the first degree (State v. Lunsford, Mo., 331 S.W.2d 538, 540 [3, 4]; State v. Tripp, Mo., 303 S.W.2d 627, 631 [2]) without her further participation in or presence at the offense (State v. Holloway, 355 Mo. 217, 195 S.W.2d 662, 664 [1–3]; State v. Mason, supra; State v. Menz, 341 Mo. 74, 106 S.W.2d 440, 448 [9]; State v. Hill, 352 Mo. 895, 179 S.W.2d 712, 714).

Appellant has not established error.

V. Appellant's brief contains points V through XII claiming error in the admis-

sion of the testimony of different witnesses without the citation of any authority except under Points X and XI. See Supreme Court Rule 83.05, V.A.M.R. The testimony of these witnesses pertained largely to acts of and statements by Bill Shindler outside the presence of appellant and appellant claims there was no proof of a conspiracy between appellant and Shindler, and the testimony respecting the acts and statements of Shindler was hearsay and incompetent. We need not discuss each of these points.

For example, John Hodges, 75 years old and totally blind for three years, testified he had known Bill Shindler for fifteen years; they were good friends and, off and on for about a year, had had conversations about Mr. and Mrs. Deyo, Shindler telling him he was going to do something to Mr. Deyo, that appellant was a fine woman and he was going to have her. Shindler told him appellant said she was going to get rid of Deyo. Shindler said he was "stickin' to Deyo's wife whenever Deyo was gone"; that appellant would turn on the porch light and he would stay with her, have breakfast before daylight and go home; that they planned to give Deyo sleeping tablets, take him fishing and roll him in the lake but the tablets had no effect on him. About two weeks before Deyo's death, Shindler told him they were going to give Deyo strychnine, and told him on Sunday before Deyo's death that he, Shindler, had some strychnine and was going to put it in Deyo's vitamin box. Witness didn't remember whether Shindler told him appellant knew "all about the strychnine."

■ Appellant's cases are State v. Loeb, Mo., 190 S.W. 299, 304; State v. Faulkner, 175 Mo. 546, 591, 75 S.W. 116, 130, cited in the Loeb case; State v. Chernick, Mo., 278 S.W.2d 741, 747, 748; State v. Chernick, Mo., 280 S.W.2d 56, 59, 60. We understand the holdings, insofar as possibly applicable here, in the Loeb and Faulkner cases to be that statements or declarations of a co-conspirator against one

not present when the statements or declarations are made are inadmissible in the absence of any testimony to show that a conspiracy existed (State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22, 28); and in the Chernick cases (see 278 S.W.2d 746) to be that: "After the common enterprise is ended, whether by accomplishment or abandonment, no one of the conspirators or joint actors is permitted by any subsequent act or declaration of his own to affect the others."

We have hereinbefore considered there was sufficient probative evidence for the jury to infer the existence of a conspiracy between appellant and Bill Shindler to do away with appellant's husband. Shindler's statements during the existence of the conspiracy were admissible in evidence. State v. Rosegrant, 338 Mo. 1153, 93 S.W. 2d 961, 974 [27]; State v. Johnson, Mo., 286 S.W.2d 787, 792 [7]. It may be that certain portions of the testimony of particular witnesses could be properly objected to upon a retrial, but appellant's authorities and objections interposed do not establish error.

VI. The transcript of the testimony of C. W. Duffer at appellant's preliminary hearing was read in evidence, and appellant claims error in that there was no sufficient showing of diligence on the part of the State to obtain said witness's presence at the trial for its admission in evidence, and that the witness's absence from the State was not established by competent evidence.

The prosecuting attorney knew on May 8, 1961, that this case was set for trial on June 6. He had had difficulty in securing witness Duffer's presence at the preliminary hearing of Bill Shindler by reason of the witness's preaching outside of the State at that time. He stated his information was that witness Duffer had moved out of the State; had returned to Ava, and had left again and gone to Oklahoma.

A subpoena, dated May 29, 1961, and issued out of the Circuit Clerk's Office of

Ozark County for several witnesses on be-half of the State, was received by Don Souder, Sheriff of Douglas County, as we read his testimony, on May 31 or June 1. Sheriff Souder testified that his office worked on his books June 1st and he believed he first sought to serve the subpoena on witness Duffer on June 2nd or 3rd; that he had the subpoena in his pocket or his car all the time; that he made five trips to the Duffer residence, the fifth being after dark June 5th, and on June 6th filed his return stating, among other things, that witness Duffer could not be found in Douglas County. He testified that witness Duffer resided permanently in Ava and Mrs. Duffer taught school there; that Mr. Duffer was in Ava for about thirty days before the trial, the last time he saw him being a week or ten days before June 6th; that he could have served the subpoena on witness Duffer had he received it ten, twelve or fourteen days prior to June 6th, and that he attended to this subpoena as soon as he possibly could in the course of his work. He testified he made inquiry concerning the whereabouts of witness Duffer and, over the objection that it was hearsay, stated he was told Duffer had gone to Oklahoma and would not be back by June 6th.

We think the fact inquiry was made concerning the whereabouts of the witness tended to establish diligence on the part of the officer. However, the fact that his informants told him Duffer was in Oklahoma, so far as disclosed by this record, was subject to appellant's timely objection that it was hearsay and was not probative evidence of the witness's absence from the State authorizing the admission of his testimony at the preliminary hearing. See State v. Gallina, 352 Mo. 557, 178 S.W. 2d 433, 434. Notwithstanding the difficulty in securing Mr. Duffer's presence at the preliminary hearing of appellant's co-defendant, the effort made by the State's attorney to secure his presence at this trial was the issuance of a subpoena on May 29th for the trial set for June 6th. While

the Sheriff of Douglas County may have diligently discharged his duties after receiving the subpoena, the State's attorney exhibited less diligence than was shown in the Gallina case. We conclude Mr. Duffer's testimony at the preliminary hearing should not have been admitted in evidence. State v. Kain, Mo., 330 S.W.2d 842, 844. Compare State v. Harp, Banc, 320 Mo. 1, 6 S.W.2d 562, 563 [2].

This testimony of witness Duffer was a link in the establishment of the pathological and toxicological examinations upon the body of Mr. Deyo. The fact that it was improperly admitted in evidence does not entitle appellant to be discharged, but requires that the case be reversed and remanded to afford the State an opportunity to properly establish this fact by the testimony of Mr. Duffer or by other evidence. See State v. Watson, Mo., 350 S.W.2d 763, 768 [4].

VII. Counsel for the appellant on several occasions during the progress of the trial informed the court that no defense of insanity was in the case. Appellant's witnesses Herman Melton and James E. Bane each testified he gave appellant an "I. Q.," or "intelligence quotient" test, and witness Melton testified appellant's mental age, "that means, how does she compare with children in school in learning," was that of a twelve year old and witness Bane gave appellant a rating of a ten or ten and one-half year old child. This testimony was offered and admitted in evidence for the sole purpose of letting the jury consider that circumstance along with other circumstances in deciding whether or not appellant's statements were voluntarily given. Appellant next placed on the stand Dr. Selden W. Chambers, who had practiced medicine for twenty-seven years and was then engaged in the general practice at Mountain Home, Arkansas. He had had three years' experience in psychiatry at the State Hospital for Mental and Nervous Diseases, five years' psychiatric work in his county for the Government in connection with the induction of soldiers that

were thought possibly to present mental cases, and had been called in consultation on psychiatric cases by his colleagues. His testimony was offered in corroboration of the testimony of witnesses Melton and Bane and to show that appellant was feeble-minded as affecting the voluntariness of appellant's statements and confession.

■ Appellant complains of the trial court's ruling that Dr. Chambers was not qualified to give testimony corroborating that of said witnesses, and that his testimony would be merely cumulative. Trial courts have a wide discretion in this matter, but we are of opinion that upon proper questioning appellant was entitled to the offered testimony of Dr. Chambers, who had some training in psychiatry, in addition to the testimony of the psychologists Melton and Bane.

■ We are mindful that, on the issue of insanity as a defense, " 'the mental test for criminal responsibility is whether the accused was capable of distinguishing right from wrong as applied to the particular act.' " State v. Goza, Mo., 317 S.W. 2d 609, 613 [2]; State v. Bannister, Mo., 339 S.W.2d 281 [2]. We have also said: "Where it is not contended that the accused is an idiot, lunatic or insane person, evidence of feeble intellect and weak intelligence is not admissible." State v. Jackson, 346 Mo. 474, 142 S.W.2d 45, 49 [7]. And: "While there is a common-law presumption in this state that an infant between the age of seven and fourteen has no criminal capacity * * *, there is no such presumption in favor of an adult of that alleged mental age." Id., 142 S.W.2d 1. c. 50 [11]. "Moronity, mere weakness of intellect, or subnormal mental capacity, is not in and of itself such insanity or mental incapacity as constitutes an excuse or defense to a crime." State v. Pinski, Mo., 163 S.W.2d 785, 787 [4].

■ VIII. In instruction No. 11, on the voluntariness of appellant's statements, the court instructed that "by the term 'voluntarily' the Court means not secured by intimidation or duress." Appellant has preserved for review the contention that the definition should have also included whether appellant's statements were obtained by promises to appellant. We think this contention of appellant well taken under the record before us. Consult State v. Barnett, Mo., 338 S.W.2d 853, 856 [2, 5]; 23A C.J.S. Criminal Law §§ 1135 (p. 295), 1230 (p. 582); and instructions in State v. Cunningkin, Mo., 261 S.W.2d 85, 86; State v. Pillow, Mo., 169 S.W.2d 414, 416.

IX. The court gave an instruction (No. 12), the first paragraph of which was to the effect that criminal responsibility of an accused did not depend upon his mental age, whether above or below the average of a normal person; that mere weakness of mind, ignorance or deficient mental capacity did not excuse a crime, unless accused's mentality was such as to render accused incapable of distinguishing between right and wrong.

The second paragraph instructed the jury "that a defendant in a criminal case must prove, by a preponderance, or greater weight of the evidence, that at the time of the commission of a criminal act that the defendant did not know the difference between right and wrong. You are instructed that there has been no evidence on this question introduced by the defendant, and therefore you are not to consider, as an issue in this case, whether or not the defendant, Grace Deyo, at any time during the year 1959, knew the difference between right and wrong."

The concluding paragraph instructed the jury that "any evidence in the case concerning the mental age, I. Q. or degree of mentality of the defendant, Grace Deyo, is admissible" only for the jurors' consideration, together with all other facts and circumstances outlined in instruction No. 11 (on the voluntariness of appellant's statements), in determining whether appellant's statements were made voluntarily.

■ The State advances the contention that appellant entered only a general objection to all the instructions and has not preserved any error for review. Appellant entered an oral objection to instruction No. 12 and others at the time of submission and followed this by stating in her motion for new trial the specific grounds upon which she relied for error in instruction No. 12. This is sufficient to preserve the issues specified for review. Supreme Court Rule 27.20.

■ The second paragraph, quoted supra, of the instruction is broad in its terms and subject to criticism. The first sentence would have more properly stated the law had the word "must" been eliminated and the words "in which insanity is interposed as a defense has the burden to prove" been inserted after "a defendant in a criminal case." The sentence, as worded, tended to put the burden on appellant to prove she did not know right from wrong, although insanity was not an issue; and the next sentence (also quoted) told the jury there was no evidence of and they were not to consider whether appellant knew the difference between right and wrong. We think upon a retrial an instruction involving the defense of insanity need not be given, as appellant contends, and the court could well limit the instruction to the purpose of the evidence adduced on behalf of appellant.

X. At the opening of court, the regular judge presiding, a minister gave an invocation in the presence of the jury panel stating, among other things: "We realize that there are those who commit sin and that they must be punished and ask that we be given the strength to punish them according to Thy will." Appellant contends that the trial court, in view of the charge against the appellant, should have granted appellant's request to discharge the jury panel. We need not rule the contention because this situation is not likely to occur upon a retrial. A word of caution to a minister in appropriate instances should be sufficient.

XI. In view of what we have heretofore said it appears unnecessary to set out or rule in detail the contentions preserved for review with respect to the refused instructions requested by appellant, instructions Nos. 14, 16 and 17. The attorney for the State will have an opportunity of re-examining the refused instructions and the instructions given by the State in the light of appellant's criticisms and our views herein expressed and redrafting them where necessary. Appellant's refused instruction No. 14 is covered by given instructions Nos. 3, 7 and 8. Instruction No. 8 should be examined in connection with instruction No. 3, ¶ 26 of appellant's motion for new trial (a point not made in appellant's brief) and this opinion. Appellant's refused instructions Nos. 16 and 17, relating to her statements, are covered by given instruction No. 11, subject, however, to our ruling supra with respect to the omission from said instruction No. 11. See ¶ VIII, supra. Some of the given instructions appear to be favorable to the appellant. We think a transcript should show which of the given instructions were offered by the State, and which, if any, were offered by the accused, including instructions offered by the accused and modified by the court and in what respects such instructions were modified. We do not find this expressly shown in the transcript at bar.

The judgment is reversed and the cause is remanded.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.